**The STATE of Ohio, Appellee,**

**v.**

**GRIFFIN, Appellant.**

[Cite as *State v. Griffin* (2001), 142 Ohio App.3d 65.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–990779.

Decided March 30, 2001.

66

68

*Michael K. Allen,* Hamilton County Prosecuting Attorney, and *William E. Breyer,* Assistant Prosecuting Attorney, for appellee.

*Michaela M. Stagnaro,* for appellant.

GORMAN, Presiding Judge.

A jury found the defendant-appellant, Joseph Griffin, guilty of aggravated murder as the result of the shooting death of his wife, Pamela Griffin. He was sentenced to life imprisonment together with three years on a gun specification. In his appeal, Griffin raises four assignments of error in which he challenges (1) the prosecution's reliance on other-acts and hearsay evidence, (2) remarks made by the prosecution to the jury reflecting upon the evidence and his character, (3) the sufficiency of the forensic evidence to establish that his wife's death was a homicide as opposed to a suicide, and (4) the jury's weighing of the evidence.

Because we hold that the trial court improperly admitted evidence of other acts through testimony of neighbors and hearsay of the victim, and because we cannot say that the effect of such evidence was harmless, we reverse and remand for a new trial.

## FACTS

On September 2, 1998, sometime between one and two o'clock in the afternoon, Pamela Griffin was fatally shot in the head in the trailer-park home she shared with Joseph Griffin and their two children. The weapon was a .38–caliber revolver that Griffin had purchased within the previous month. The bullet entered Pamela's head under the right ear and lodged in her skull, producing no exit wound.

Griffin, who was with his wife, placed a 911 call, telling the operator that his wife had committed suicide. The 911 operator sent an ambulance and coached Griffin through an attempt at cardiopulmonary resuscitation. Law enforcement

and emergency medical personnel soon arrived upon the scene. They found the weapon lying to the left of Pamela's body on the couple's bed. Efforts by paramedics failed to resuscitate Pamela, and she was later pronounced dead at the hospital.

Speaking to the police at the scene and later at the police station, Griffin stated that, prior to her suicide, he and Pamela had argued and that she had told him, "I wish I was dead." He then described how, after going to the bathroom, he came back into the hall and, peering into the bedroom, discovered that Pamela had taken the gun in her left hand and put it to her head. According to Griffin, Pamela then grinned at him and pulled the trigger.

Homicide investigators were suspicious of Griffin's version of events. Their suspicions were aroused primarily by the lack of "blow-back" spatter in the bedroom and on Pamela's hands. They reasoned that if Pamela had shot herself by holding the gun in contact with her head, blood should have blown back upon her arm in a spatter pattern as the result of pressure expelled through the wound. The lack of "blow-back" spatter on Pamela was disturbing, as was the actual spatter of blood they detected on Griffin's shirt. Further, investigators could not reconcile the placement of the gun on the left side of Pamela's body with the location of the bullet wound under her right ear.

Subsequent investigation of the relationship between Griffin and Pamela revealed recent episodes of domestic violence. Due to an industrial accident, Griffin had been unemployed while Pamela worked as a nurse's aide at the Riverview Nursing Home. According to different witnesses, Griffin became mistrustful of his wife, suspecting her of having an affair. As portrayed by the prosecution, Griffin's emotional instability, as well as his use of drugs and alcohol, exacerbated this mistrust. After Griffin obtained the .38–caliber gun on August 10, neighbors at the trailer park witnessed episodes in which he had physically abused his wife while brandishing the gun. One neighbor described an incident in which Griffin, with gun in hand, had pushed Pamela against the trailer and threatened to kill both of them. On the day of his wife's shooting death, Griffin had purchased a particularly lethal type of bullet referred to as a "hollow point."

The prosecution also presented the testimony of coworkers, who described Pamela as feeling increasingly threatened by her husband, particularly in the days leading up to her death. One witness told of Pamela bringing the family's steak knives to work because of her fear of what her husband might do with them. Witnesses also described her as having bruises on her arms and legs. Two days before Pamela's death, Griffin was discovered at the nursing home going through the time cards. When asked to leave, according to the witness, Griffin announced, "You'll never see her again"—an apparent reference to Pamela.

At trial, Griffin did not testify. Instead, Griffin's defense relied on witnesses whose testimony suggested that Pamela had become suicidal due to the deteriorating, turbulent nature of her marriage. Further, Griffin presented the testimony of a highly qualified expert in blood spatter, who disputed the prosecution's theory that the absence of blow-back spatter confirmed a homicide. The expert also testified that he had produced experimental support for the defense position that the blood on Griffin's shirt had been expirated by the victim during CPR. Finally, Griffin presented family witnesses who testified to Griffin's apparently genuine grief over the death of his wife and his persistent questioning of why she had committed suicide.

## OTHER–ACTS AND HEARSAY EVIDENCE

In his first and second assignments of error, Griffin argues that the trial court improperly allowed the prosecution to present character and hearsay evidence to portray him as a violent substance abuser who terrorized not only his wife, but also the neighbors at the trailer park where the couple lived.

■ The rule governing the admissibility of character or other-acts evidence is contained in Evid.R. 404. Section (A) states the general principle that evidence of a person's character is "not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion * * *." The reason for the general exclusion of character evidence is the temptation it poses for the jury to try the case on evidence of character rather than on evidence of guilt. When such character evidence is allowed, it becomes difficult for the jury not to speculate that since the defendant has shown a propensity for committing criminal or bad acts in the past, *i.e.*, is a bad person, he probably committed the present crime. The result is a potential for prejudice with respect not only to the weighing of the evidence but also the creation in the jury's mind of an urge to punish for past acts. Lily, The Law of Evidence (1978) 124, Section 43.

■ Evid.R. 404(B) specifically states the same rule of exclusion for evidence of "other crimes, wrongs, or acts." The rule provides, however, for an exception when the prosecution seeks to introduce evidence of other bad acts not to show the accused's character or his criminal propensity, but to establish circumstantially either an element of the crime or a material fact at issue. Specifically, Evid.R. 404(B) allows the introduction of evidence of "other crimes, wrongs, or acts" when that evidence is used as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or the absence of mistake or accident." This principle is further embodied in R.C. 2945.59, which provides:

"In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in

doing an act is material, any acts of the defendant[,] which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant."

The Ohio Supreme Court has held that both R.C. 2945.59 and Evid.R. 404(B) are to be strictly construed against the state and conservatively applied by trial courts. *State v. DeMarco* (1987), 31 Ohio St.3d 191, 194, 31 OBR 390, 392–393, 509 N.E.2d 1256, 1259. As the court pointed out in *DeMarco*, evidence of other acts is admissible " 'not because it shows that the defendant is crime prone, or even that he has committed an offense similar to the one in question, but in spite of such facts.' " *Id.*, quoting *State v. Burson* (1974), 38 Ohio St.2d 157, 158, 67 O.O.2d 174, 174–175, 311 N.E.2d 526, 528.

■ The threshold question in determining the admissibility of other-acts evidence under Evid.R. 404(B) is whether any of the matters of proof (motive, opportunity, scheme, etc.) are at issue in the case. If not, then other-acts evidence is not admissible, no matter how telling, and regardless of whether an accused's past behavior constitutes a "behaviorist fingerprint." See *State v. Knight* (1998), 131 Ohio App.3d 349, 722 N.E.2d 568.[1]

■ The state, citing *State v. Greer* (1981), 66 Ohio St.2d 139, 20 O.O.3d 157, 420 N.E.2d 982, argues that Griffin "place[d] his intent at issue by entering a plea of not guilty." This is an incorrect statement of the law and a misreading of *Greer*. A plea of not guilty does not automatically place at issue any of the factors necessary to allow for the admissibility of other-acts evidence (If such were the case, there would be no reason for the rule.) That determination must instead be made upon the theory of the case as presented by the prosecution and the defense. As recently emphasized by the Second District Court of Appeals:

"Evid.R. 404(B) creates an exception for [other-acts] evidence when it is, nevertheless, also probative of certain matters identified in the rule. However, the *matter* concerned must genuinely be in issue. *State v. Smith* (1992), 84 Ohio App.3d 647, 617 N.E.2d 1160. Further, the other act or acts offered as probative of the matter must themselves be temporally and circumstantially connected to the operative facts of the offense alleged. *State v. Burson* (1974), 38 Ohio St.2d 157, 67 O.O.2d 174, 311 N.E.2d 526; *State v. Curry* (1975), 43 Ohio St.2d 66, 72

---

1. In the author's view, this court failed to adequately address in *Knight* upon what basis, other than its similarity, the other-acts evidence in that case was admissible.

O.O.2d 37, 330 N.E.2d 720; *Smith, supra.*" (Emphasis sic.) *State v. Hawn* (2000), 138 Ohio App.3d 449, 462, 741 N.E.2d 594, 603.

## A. Other Acts of Violence by Griffin Toward the Victim

■ At trial, the prosecution solicited testimony from neighbors at the trailer park where the couple lived who had personally observed Griffin physically assault, verbally abuse, and threaten to kill his wife in the weeks before her death. The state argues that the admission of such evidence was proper to show Griffin's identity as the killer. We agree.

Griffin's defense was that he was misidentified as the killer—in essence, that someone else did the shooting, not he. By interposing such a defense (as opposed, for example, to accident or self-defense), he put in issue his identity as the killer.

"Identity is in issue when the fact of the crime is open and evident but the perpetrator is unknown and the accused denies that he committed the crime. In that event other act evidence tends to show the defendant's identity as the perpetrator by showing that he committed crimes of a similar methodology within a period of time reasonably near to the offense on trial, which itself would constitute probative evidence of the probability that the same person, whoever he or she may be, committed both crimes." *Smith, supra,* at 666–667, 617 N.E.2d at 1173.

Here, the fact of the crime—the shooting death of Pamela—was open and evident. The only issue was whether it was Pamela or Griffin who fired the fatal shot. Evidence of other episodes in which Griffin had threatened to kill his wife with the same gun was circumstantial evidence identifying him as the killer. Furthermore, such episodes, occurring weeks before her death, were sufficiently temporally connected to the facts of her death to be probative on the issue of the identity of the shooter.

It should be pointed out that since oral argument in this case, the Second District Court of Appeals in *Hawn, supra,* has ruled that in a murder or suicide case the identity of the perpetrator is *not* in issue. Explaining its reasoning, the court stated:

"According to the theory of the state's case and the evidence it presented, if the alleged crime took place at all, no person other than Hawn [the defendant] could have committed it. Further, Hawn did not claim that another person had murdered Jack [the victim]. Instead, he denied that she was murdered at all. The only genuine issue, therefore, was whether Jack was murdered or whether she committed suicide. Because the identity of the perpetrator of the state's murder alternative was not in issue, evidence of defendant Hawn's prior acts

extrinsic to the operative facts of the crime alleged was not admissible per Evid.R. 404(B) to prove identity." *Hawn, supra,* at 463, 741 N.E.2d 594.

■ We respectfully disagree with the Second District Court of Appeals on this issue. The court's analysis, in our view, errs by concluding that in a murder or suicide case the defendant is the only suspect. As we have noted, in our view there are two suspects—the defendant and the victim. While it is true that only one of the suspects, the defendant, can be found guilty of murder, evidence of suicide creates a genuine issue concerning the identity of the person who pulled the trigger. Thus, we believe that, in a case such as this, and in *Hawn,* evidence of other acts of domestic violence, particularly those involving the same gun used in the killing, and occurring within the same time period as the shooting, should be admissible under Evid.R. 404(B) to establish the identity of the shooter.

■ Finally, we reject the argument that identity was not in issue here because there was no dispute that Griffin was physically present in the trailer at the time the shooting occurred. Identity is not synonymous with mere presence. For example, if Griffin had claimed that a burglar had entered the trailer on that afternoon and shot his wife while he was in the bathroom showering, identity would certainly be at issue. See *State v. Aldridge* (N.C.App.2000), 534 S.E.2d 629 (evidence of domestic violence against former wives admissible to show identity where defendant claimed that intruder had broken into house and killed his current wife while he was present). Similarly, if O.J. Simpson had claimed that he was standing next to Nichole Brown when unidentified assailants murdered her, identity would have been in issue. Whether the act of killing is by fictional third parties or by the victim's own hand, a defense that amounts to "someone else did it, not me" raises the issue of identity.

### B. Other Acts of Drug or Alcohol Abuse Not Involving the Victim

In addition to acts of violence against Pamela, the prosecution also solicited, or attempted to solicit, testimony that Griffin was seen often around the trailer park in an intoxicated or drug-induced state. For example, the state asked Cathy Sue Vinson whether Griffin appeared to her to be under the influence of drugs or alcohol on those occasions when she had seen him walking by himself around the trailer park in a *two-month* period before Pamela's death. An objection to the question was sustained. But the trial court overruled an objection and allowed another witness, Candice Black, to answer a question whether she had ever seen Griffin under the influence of drugs or alcohol during the *summer* that Pamela died. Black answered that she had. (The prosecution then asked whether it "was unusual" for Griffin to be seen in such a condition. After Black answered that it was not, the trial court sustained a defense objection and advised the jury to disregard both the question and the answer.)

The prosecution next solicited from Black testimony concerning an incident in which Griffin had allegedly approached Black and her teenage friends two weeks before his wife's death, pulled a gun out of the waistband of his trousers, and threatened to "fucking kill" them. The prosecution then asked, "You've indicated that at times you've seen him under the influence. On that date when you saw the gun in his waistband and he made the threat to you, do you have an opinion as to whether or not he was under the influence that day." Black answered, "He was." A defense objection was overruled.

▓ The state argues on appeal that testimony regarding Griffin's general alcohol or substance abuse "was admissible as to motive" because "it contributed to the breakdown of his marriage and his violent behavior toward his wife." Griffin was not on trial, however, for ruining his marriage or for any of the other prior acts of violence toward his wife. He was on trial for shooting his wife. Critically, the prosecution did not present any evidence that Griffin was under the influence of either alcohol or drugs on the day of his wife's death. To the contrary, Officer Bryan Pitchford, who interviewed Griffin at the scene, testified that Griffin was "calm" and "spoke intelligently, calmly." The officer, in fact, rejected a defense suggestion that Griffin might have been somewhat hysterical after the shooting, stating that Griffin was, contrary to expectation, "pretty calm" and that he was cooperative throughout the investigation that day. To the extent that Griffin's behavior aroused suspicion that day, it was because witnesses thought he was acting too emotionless or "flat," not because he was acting excitable or irrational.[2]

Without any evidence directly implicating Griffin's alleged substance abuse in the shooting of his wife, we fail to see how evidence of Griffin's alleged drug or alcohol use was a matter genuinely in issue. Put differently, we fail to see how such evidence was circumstantially connected to Pamela's shooting. Significantly, during closing argument, the state did not propose that Griffin may have been under the influence when he allegedly shot his wife. Rather, the prosecution's only attempt to connect the alleged substance abuse to Pamela's death during closing argument was to state that Griffin had become insanely jealous and was "not helping himself by being on drugs and alcohol from *time to time*." We consider this—the fact that Griffin was "not helping himself"—to be a particular-

---

2.   Interestingly, the owner of the gun shop where Griffin bought the bullets on the morning of his wife's death gave a written statement to the police in which he stated that Griffin had been acting "much different" than he had the two times he had been in the store before. The owner stated that Griffin was quite "animated," whereas before he had seemed subdued, and that Griffin "seemed a different person." When the prosecution attempted to solicit the same testimony at trial, however, a defense objection was sustained. The written statement was not introduced into evidence.

ly weak, not to mention speculative, basis upon which to present to the jury evidence that Griffin was an alcohol or drug abuser.

The state cites *State v. Wilkinson* (1980), 64 Ohio St.2d 308, 18 O.O.3d 482, 415 N.E.2d 261, for the proposition that evidence of Griffin's alleged drinking and drug abuse was "so involved in his motivation as to be inseparable." The decision in *Wilkinson*, however, concerned evidence of a prior drug sale interlaced in conversation during negotiations for the drug sale that was the subject of trial. The Ohio Supreme Court upheld the admission of the evidence because " '[r]eference to the prior [drug] sale was intrinsic to the bargaining' " for the drug sale that was the object of the trial. *Id.* at 316, 18 O.O.3d at 488, 415 N.E.2d at 268, quoting *People v. Vails* (1977), 43 N.Y.2d 364, 368, 401 N.Y.S.2d 479, 481–482, 372 N.E.2d 320, 322–323. In our view, the facts of *Wilkinson* are completely distinguishable from those here. The record in this case presents no basis to conclude that Griffin's alleged episodes of drug or alcohol abuse "from time to time" were in any sense intrinsic to the shooting death of his wife. As we have noted, it is entirely speculative whether drugs or alcohol played any role in Pamela's death. We reject, therefore, the state's argument that the earlier unrelated episodes of alleged drug and alcohol abuse were somehow "inseparable" from Griffin's alleged motivation for killing his wife.

### C. Other Acts of Violence against Neighbors in the Trailer Park

██ As we have noted, Candice Black testified concerning an incident in which Griffin had allegedly threatened to "fucking kill" her and her other teenage friends while acting as if he was either drunk or on drugs. In its brief, the state does not offer any justification for the admission of this evidence other than to implicitly link it to Griffin's drug use and thus his "motive" for killing his wife. We have already rejected the relevance of Griffin's alleged drug or alcohol abuse due to the prosecution's failure to produce evidence circumstantially connecting it to Pamela's death.

Even more circumstantially disconnected, however, was Griffin's behavior toward the group of teenage girls. Unlike the prior episodes of domestic violence between Griffin and his wife, this episode appears to have had nothing to do circumstantially with the shooting death of Pamela. Rather, the only purpose of such testimony appears to have been to portray Griffin as a person with violent propensities-the terror of the trailer park.

### D. Other Acts Introduced through Hearsay by the Deceased Victim

Griffin also challenges the prosecution's solicitation from another witness, Kimberley Wesley, of testimony concerning incidents described to her by Pamela. Accordingly to Wesley, Pamela told her that she had brought the family steak

knives to work because of fear spawned by incidents in which she had awakened to find Griffin holding a knife to her throat and threatening to kill her. Griffin challenges this testimony not only as a violation of Evid.R. 404 but also upon the basis that it constituted hearsay.

As this court has held in a similar murder case, *State v. Sutorius* (1997), 122 Ohio App.3d 1, 701 N.E.2d 1, statements that the deceased victim feared the defendant are admissible under Evid.R. 803 to show the victim's "then existing state of mind, emotion, [or] sensation * * *." Our decision in *Sutorius* was based upon the Ohio Supreme Court's decision in *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 514 N.E.2d 394, in which the court held that hearsay evidence reflecting a victim's fearful state of mind and fear of the defendant was admissible, while hearsay testimony establishing the facts underlying that fear was not.

It should be noted that the court in *Hawn, supra,* criticized the Ohio Supreme Court's holding in *Apanovitch,* finding it irreconcilable with the court's subsequent holding in *State v. Greer* (1988), 39 Ohio St.3d 236, 530 N.E.2d 382. According to the court in *Hawn,* the Supreme Court in *Greer* refused to allow a defendant the same right to introduce evidence that the victim was afraid when the object of that fear was a person other than the defendant. Again, we have to respectfully disagree with the court in *Hawn.* In *Greer,* the Ohio Supreme Court ruled specifically that the hearsay testimony of the victim that the defendant wished to introduce did not reflect fear, and that the jury would have to speculate as to its meaning. Thus, we do not agree with the court in *Hawn* that the holdings of *Apanovitch* and *Greer* represent two different rules on the admissibility of such evidence, one for the prosecution and one for the defendant. It is noteworthy in this regard that the Ohio Supreme Court in *Apanovitch* cited as authority *United States v. Cohen* (C.A.5, 1980), 631 F.2d 1223, a case in which the defendant, not the prosecution, was allowed to introduce testimony of state-of-mind witnesses to demonstrate that he had acted out of fear of his codefendants.

We disagree, further, with the court's view in *Hawn* that it is better that such evidence should be excluded for both parties, as it "invites speculation, not rational inference." *Hawn* at 460, 741 N.E.2d at 602. The victim's fear of the defendant can be a particularly compelling piece of circumstantial evidence, particularly in a case such as this, where the defendant is the only other person present at the victim's shooting and professes to have been an innocent observer. Pamela's fear, it strikes us, was just as much a part of the crime scene as the forensic evidence. Without evidence of her fear, the jury would have been left without an important clue as to what really happened. Concededly, such evidence could be used to introduce "through the back door" evidence of the defendant's bad character, as *Hawn* suggests. *Id.* To alleviate the risk of this, however, the rule specifically forbids the introduction of the victim's hearsay

statement to establish the facts giving rise to the fear. So long as this prohibition is assiduously followed, other-acts evidence should not come in through the back door.

In the present case, Wesley testified both to the fact of Pamela's fear and to the reason for her fear—the incidents in which she had allegedly awakened to find Griffin pointing a knife at her throat. The state does not attempt to argue that Pamela's hearsay statements regarding such incidents were admissible. They were clearly not under the holding of *Apanovitch*, our decision in *Sutorius,* and Evid.R. 803. But the state does argue that defense counsel opened the door to such testimony during cross-examination. We disagree.

On direct examination, Wesley testified that Pamela would bring the family steak knives to work on occasion and "would hide them in our cleaning room for several days at a time because she said that she was afraid that he [Griffin] would kill her." This testimony narrowly avoided the rule that hearsay testimony of the victim cannot be used to establish the facts underlying the victim's fear, as the jury would have been hard-pressed not to associate Pamela's fear and her bringing the knives to work with some threat involving the knives. On cross-examination, defense counsel asked Wesley whether she did not find it "unusual" that Pamela would periodically bring the knives to work and then take them home again, suggesting that, if she was really afraid of her husband, she would never have taken the knives back home. Wesley testified that she did not find Pamela's behavior unusual given the "stories" Pamela had told concerning the knives. Defense counsel, obviously not wanting to delve into the "stories," dropped the subject and moved on to another line of questioning. Immediately, however, on re-direct examination, the prosecution asked Wesley to explain what she meant by "stories." Over objection, Wesley testified concerning Pamela's hearsay statements about waking up to find Griffin holding a knife to her throat.

Despite the state's urging, we hold that, under the above scenario, defense counsel did not open the door to the hearsay testimony concerning the cause of Pamela's fear of the knives. Rather, defense counsel avoided opening the door by dropping the subject of the knives once Wesley obliquely referred to the "stories" told to her by Pamela. It was clearly the prosecution, not the defense, that solicited the improper hearsay testimony concerning Griffin's alleged use of the knives to threaten his wife.

It should be noted that the "open door" theory is theoretically intended to be *curative.* The justification for a party's use of improper rebuttal evidence is the necessity to respond to the opponent's first use of such evidence. In other words, the theory is a means of counterattack. Here, rather than as a response to improper hearsay, the state is urging the "open door" theory as a means to

justify the state's introduction of improper, highly prejudicial hearsay evidence for the first time.

## HARMLESS–ERROR ANALYSIS

To summarize, we hold that the jury in this case was improperly exposed to evidence that (1) Griffin was a drug or alcohol abuser, prone to being seen around the trailer park in an intoxicated state; (2) while apparently high on either drugs or alcohol, Griffin had threatened to "fucking kill" a group of teenage girls by waving the alleged murder weapon at them in a threatening manner; and (3) Griffin had awakened his wife at night by holding a knife to her throat and threatening to kill her.

■ The question we must address now is whether the admission of such evidence, in a case based entirely on circumstantial evidence, was harmless. The standard for determining this issue depends upon whether the errors involved a nonconstitutional violation or were of constitutional magnitude. If there was a constitutional violation, then, in order to consider the errors harmless, we must find that beyond a reasonable doubt the errors did not contribute to the verdict. *State v. Johnson* (1994), 71 Ohio St.3d 332, 339, 643 N.E.2d 1098, 1105. Conversely, if the errors were not of a constitutional nature, then they may be deemed harmless so long as there was substantial other evidence to support the guilty verdict. *State v. Webb* (1994), 70 Ohio St.3d 325, 335, 638 N.E.2d 1023, 1032.

■ We hold that the errors were of a constitutional magnitude. The admission of the hearsay evidence of Griffin holding a knife to his wife's throat while threatening to kill her did not fall within any of the hearsay exceptions and thus violated his rights under the Confrontation Clause. *Webb, supra,* at 335, 638 N.E.2d at 1032; see, also, *DeMarco, supra* (applying constitutional harmless-error analysis to introduction of inadmissible hearsay). While the other-acts evidence of his alleged drug or alcohol abuse and his threats to kill his teenage neighbors did not, by themselves, invoke a particular constitutional protection, we hold that, when combined with the testimony concerning the knives, the cumulative effect of such evidence raised concerns over the fairness of the trial, thus invoking Griffin's constitutional right to procedural due process. *Webb* at 334, 638 N.E.2d at 1032. It should be noted that the prosecution's use of the other-acts evidence was not isolated within the context of the trial, but was part of what was manifestly a strategy to portray Griffin as an emotionally unstable person to be feared for his violent propensities. Indeed, at one point the prosecution attempted to solicit from one of the trailer-park witnesses testimony that she was even afraid to come into the courtroom to testify against Griffin.

■ Having found the errors to be constitutional in nature, we must now determine whether they were harmless beyond a reasonable doubt. In order to meet this standard, there must be "no reasonable possibility that the evidence may have contributed to the accused's conviction * * *." *DeMarco* at 195, 31 OBR at 393, 509 N.E.2d at 1260. To arrive at this conclusion, there must either be overwhelming evidence of the accused's guilt or "some other indicia that the error[s] did not contribute to the conviction." *Id.;* see, also, *Chapman v. California* (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705.

■ We have already briefly summarized the evidence against Griffin. Essentially, this evidence consisted of two components: the forensic evidence and the evidence of Griffin's assaults and threats against his wife. We discuss each in turn.

*1. The Forensic Evidence*

The prosecution attempted to show that the forensic evidence disproved Griffin's claim that his wife had committed suicide. To this end, the prosecution relied heavily upon the absence of "blow-back" spatter upon Pamela's person, particularly her arms and hands, reasoning that if she had held the gun to her head, as described by Griffin, blood and other viscera should have come out of the wound and spattered back upon her—or at least somewhere near her. Conversely, the prosecution argued, the light spattering of Pamela's blood that was visible on Griffin's tee shirt was, in fact, "blow back" spatter confirming that he had been the one who fired the gun.

To refute the state's theory, Griffin presented an expert in blood spatter, who testified that, even in the case of contact gunshot wounds (*contact* referring to the placement of the gun in touch with the body), "blow back" occurred in less than fifty percent of the cases. Further, Griffin argued that the spattering of Pamela's blood on his tee shirt occurred during his attempt at CPR, in which, he alleged, Pamela's expired blood entered his mouth and he spat it out. To support this contention, Griffin pointed to the blood that was reported around Pamela's mouth and nose by the medical personnel who arrived on the scene, as well as his own statement to the 911 operator describing such blood. (The prosecution, conversely, pointed out that the telephone did not have any blood on it, suggesting that Griffin's attempt at CPR was a sham.) Further, Griffin's blood-spatter expert testified that in two experiments he had successfully duplicated the spatter pattern on material identical to that of Griffin's tee shirt by spitting out blood. The prosecution's blood-spatter expert, on the other hand, testified in rebuttal that the blood spatter on Griffin's shirt could not possibly have been expired blood, because she did not detect on microscopic examination any mucous globules in the individual drops, which, she claimed, would have been

present had the blood been transferred by mouth. Still, providing support for Griffin's "spit theory," a serologist from the Hamilton County Coroner's office testified that the bloodstains showed a mixture of Pamela's and Griffin's DNA, and that it was possible to get DNA from saliva.

Other aspects of the forensic evidence were debated by the parties. A Gun Shot Residue ("GSR") test established that there was residue found on both of Pamela's hands (particularly the left) but none that was found on Griffin's. This evidence would seem to support Griffin's suicide defense, although the prosecution argued that Griffin had ample opportunity either to wash his hands or to rub them clean of any residue. The placement of the gun on the left side of the bed was also characterized as significant by the prosecution, since the placement of the wound suggested the impracticality, if not the physical impossibility, of Pamela shooting herself with the left hand as Griffin claimed in his statements to police. A prosecution witness pointed out that there was no hammer spur from the gun on Pamela's hands, although even the witness testified that, because such spurs were ephemeral and statistically uncertain, the lack of such a spur was not conclusive. The prosecution also pointed to the presence of a small cut on Pamela's lip that, according to the pathologist, was not self-inflicted. In the prosecution's view, the cut was evidence that Griffin and Pamela had been involved in a physical altercation before the fatal shot. The prosecution argued that a particularly critical piece of evidence was that Griffin's own blood was found on his shirt, a fact totally irreconcilable with his version of events and strongly indicating that there had been a bloody struggle prior to the shooting.

### 2. Griffin's Assaultive, Threatening Behavior before the Shooting

As we have noted, witnesses testified that Griffin had physically assaulted and threatened his wife with the gun in the days and weeks before her fatal shooting. On the evidence of record, it is clear that Griffin was a physically abusive husband who could fly easily into a violent rage. The prosecution also produced evidence that Griffin was suspicious that his wife was having an affair and would repeatedly call Pamela at the nursing home to confirm her whereabouts. There was testimony and autopsy evidence that Pamela had visible bruises, although the defense countered that such bruises were occupationally related and were not considered suspicious before the shooting. Perhaps most damaging of all to Griffin, he was observed going through the employee time cards at his wife's place of employment two days before her death and, when asked to leave, allegedly announced, "You'll never see her again."

The prosecution further emphasized that Griffin had purchased the especially lethal "hollow point" bullets on the same day that Pamela was fatally shot. Griffin attempted to counter this evidence by presenting the testimony of his

father, who stated that he had recently advised Griffin to procure a different type of ammunition after Griffin complained about a lack of accuracy during target practice. The prosecution, on the other hand, solicited testimony from the deputy coroner that, approximately ten days after his wife's death, Griffin called him in an intoxicated state, demanding his gun back for "sentimental reasons," and stating that he had bought the hollow-point bullets precisely because of their capacity to kill.

To sum up: while the merits of the forensic evidence may be argued, there is certainly a wealth of circumstantial evidence that Griffin killed his wife. This evidence includes (1) the earlier episodes of domestic violence, (2) the motive of a suspected affair, (3) Griffin's alleged announcement two days before his wife's death that her co-workers would not be seeing her again, and (4) Griffin's purchase of particularly lethal hollow-point bullets on the very morning of his wife's death. While not conclusive, the evidence is certainly compelling.

## THE POSSIBILITY OF SUICIDE

According to a taped statement Griffin gave to the police on the night of his wife's death, he and Pamela had been earlier arguing because she had supposedly lied to him. He claimed that they both went together to the gun shop where he had purchased the .38–caliber hollow-point bullets, and then came home at around one o'clock in the afternoon. He stated that he then took his revolver into the bedroom and was loading it with the new shells when Pamela came in and they began to talk. Asked if they were still arguing, Griffin replied:

"No, no, no, no. We're not arguing, right now, we're not arguing. Okay. I—I think she was still upset from, you know, maybe, you know, from where we was arguing, you know, you know, it was—it—it wasn't what you call argument. It was where I was trying to tell her not to lie to me, just to be honest with me. I said, you know, I said, I mean I said, you know, I said, 'You want to destroy our marriage?' I said, 'Marriage is got,' I said, 'I don't even know if you know anything about marriage.' I said, 'It's got to do with trust.' You know, I said, 'And if you lie to me, how am I supposed to trust you? I ain't gonna be able to believe a word, a single word you say.' "

Griffin stated that, as he discoursed in this manner, his wife said nothing. "She was like being real quiet." He stated that she did not speak until he got up to go to the bathroom, leaving the gun behind. At that point, according to Griffin, she stated, "I wish I was dead."

Griffin stated that he then went into the bathroom. And when he returned to the hallway, he saw his wife on the bed with the gun pointed at the right side of her head, with the trigger cocked. He then described how she pulled the trigger.

According to Griffin, Pamela's body fell backward with the gun still in her *left* hand. Asked again if she had used the left hand to kill herself, Griffin replied. "I guess. I—I guess, yeah, because the gun was in her left hand." But he then stated a moment later, "Oh, I don't know, I mean—I don't know." Later he stated, "It was on her left side. The gun was." The next moment he seemed to again equivocate, stating, "I mean because that's what—that's the way it looked to me, unless she had her other hand like this. I don't know. Less it dropped, and—and—and I don't know."

A transcript of the 911 call was admitted into evidence. Griffin told the operator that his wife had shot herself in the head: "Sir, she's dead. She just blowed her brains out with a .38." He then agreed to attempt CPR, during the process of which he was told to cover Pamela's mouth and to force air into her lungs. At that point, Griffin told the operator that "there's blood coming out of her nose, her mouth, and everything." Griffin then told the operator, "I can't do this. Oh, my God." The operator asked Griffin if his wife had given him any indication about committing suicide. Griffin replied that "we was just talking, and all of a sudden, she said, 'I wish I was dead,' and I had gone and she loaded it up, the—oh, Lord, Lord." Griffin then apparently continued to attempt CPR. During further exchange with the operator, Griffin recounted how he had left the room and come back to discover his wife with the gun to her head. At one point, Griffin, apparently speaking to his wife's corpse, said, "Damn, mother fuck, damn, why'd you do this, damn you." He then stated. "Looks like she shot herself in the ear. Don't know why she shot herself."

Tabatha Koger, a neighbor at the trailer park, testified that both Griffin and Pamela had appeared to be in good moods earlier on the day of the shooting. She testified that she did not believe that Pamela would commit suicide, although she did concede that Pamela "had once said that if that's the only way out, then she would do it." Ashley Griffin, the couple's twelve-year old daughter, was asked on the witness stand if her mother had ever said anything to her about killing herself. She responded, "Yes, she did. She said, 'I wish'—'I wish I could kill'—'I wish I was dead.'" Ashley was asked how many times her mother had expressed such a wish; she replied that she could not remember. Ashley also testified that several days before her mother died, she read to her the following poem:

TO A FRIEND

"A heart is not a plaything.
A heart is not a toy.
But if you want it broken just
Give it to a man.

"Boys like to play with toys
To see what makes it run
And when it comes to kissing
They do it just for fun.

"Don't ever fall in love my friend.
You'll see it doesn't pay.
It makes a broken heart my friend.
It happens ever day.

"You'll wonder where he is at night, you'll
Wonder if he's true.   One
Moment you'll be happy and the next
One you'll be blue.

"Each time you have a chance to see him
Your heart begins to dance[.][Y]our life
Revolves around him[.]   [T]here is nothing
Like romance.

"When it starts you don't know why but you
Worry day and night you see my friend.
I'm losing him and it never works out
Right.

"Love is fine but it costs so much.
The price you pay is high.
*If I had to pick between love
& death, I think I'd rather die.*

"When I say don't 'fall in Love.'
'You'll be hurt before you're through.'
You see my friend, I ought
To know, I fell in love with you!!"
(Emphasis supplied.)

As can be seen, Griffin's suicide defense was to some degree corroborated by the tenor and substance of his remarks to the 911 operator, his statements to the police, and other evidence that Pamela had contemplated taking her own life.

Ironically, the evidence of domestic abuse that the prosecution presented could have been seen as also providing substance to Griffin's claim that his wife had reached a point where death seemed a welcome respite from his abusive behavior. Griffin's statements that Pamela held the gun in her left hand were damaging to him, given the placement of the wound, but it is clear from his statements to the police that he was intermittently uncertain on this point, at times saying he did not know in which hand she held the gun. (Griffin's placement of the gun in his wife's left hand, it should be noted, though conflicting with the placement of the wound, would seem to be supported by the presence of gunshot residue.) We note further that the defense presented evidence that Griffin has an IQ in the mid-seventies, which is a state of borderline retardation. Finally, there was testimony that Griffin continued to question why his wife would commit suicide in the weeks following her death.

## CONCLUSION

While we acknowledge the compelling nature of the circumstantial evidence against Griffin, it would be disingenuous to suggest that the evidence against him was so overwhelming that there was no reasonable possibility that the improperly admitted other-acts and character evidence did not contribute to his conviction. As the prosecution's resort to such evidence attests, of critical importance in this case was the jury's perception of Griffin. For the jury to have been told that he abused drugs and alcohol, threatened to "fucking kill" teenage girls while on drugs, and held a knife to his wife's throat at night while threatening to kill her, strikes us as appreciably damaging to that perception. It is noteworthy that the prosecution, obviously convinced that the evidence would be of help to its cause, commented upon both the alleged drug and alcohol abuse and the alleged knife-to-throat incident during closing argument.

Accordingly, we hold that there was sufficient evidence to support Griffin's conviction, and that the jury's finding of guilt was not contrary to the weight of the evidence. Regrettably, however, we cannot conclude that the evidence against Griffin was so overwhelming that the extraneous other-acts evidence and impermissible hearsay could not reasonably have influenced the jury's deliberations. Indeed, had the evidence of guilt been overwhelming, we assume that the prosecution would not have offered Griffin a plea bargain of eight years on a charge of involuntary manslaughter during the course of the trial.[3] While the circumstantial evidence against Griffin was compelling, it was not conclusive.

---

3. Defense counsel made sure that Griffin rejected the plea bargain on the record.

We sustain, therefore, Griffin's first and second assignments of error. Griffin's third assignment of error is considered moot. Pursuant to our discussion of the evidence, his fourth assignment, challenging the sufficiency and the weight of the evidence to convict him of aggravated murder, is overruled.

Accordingly, Griffin's conviction is reversed, and this cause is remanded for a new trial.

*Judgment reversed*
*and cause remanded.*

SHANNON, J., concurs.

PAINTER, J., concurs separately.

RAYMOND E. SHANNON, J., retired, of the First Appellate District, sitting by assignment.

PAINTER, Judge, concurring separately.

I concur with the majority's holding and most of the well-reasoned opinion, but write separately to note that I respectfully disagree with the majority's position on *Hawn*.[4] Unlike the majority, I agree with my colleagues on the Second District Court of Appeals that, when a trial court must decide whether the deceased was murdered or committed suicide, and the defendant admits to being the only other person present when the events occurred, the identity of the defendant is *not* at issue in the case. Thus other-acts evidence purporting to identify the defendant through a "behavioral fingerprint" is not admissible.

As we have stated, "[A]dmission of other-acts evidence is strictly limited because of the substantial danger that a jury will find a defendant guilty solely because it believes a defendant has a propensity to commit criminal acts or deserves punishment regardless of whether he committed the offense."[5] One of the more obvious requirements of admissibility is that the matter the other-acts evidence is offered to prove, in this case the identity of the alleged murderer, must be at issue in the case.[6] There is no justification for admitting potentially

---

4. See *State v. Hawn* (2000), 138 Ohio App.3d 449, 741 N.E.2d 594.

5. See *State v. Echols* (1998), 128 Ohio App.3d 677, 692, 716 N.E.2d 728, 738, citing *State v. Schaim* (1992), 65 Ohio St.3d 51, 59, 600 N.E.2d 661, 668.

6. See *State v. Curry* (1975), 43 Ohio St.2d 66, 72 O.O.2d 37, 330 N.E.2d 720, paragraph one of the syllabus.

prejudicial evidence without a disputed issue. And Griffin's identity is not an issue in this case.

If the jury were to have found that Griffin's wife was murdered, then there would have been no dispute about who committed the crime, because Griffin was the only other person present. If, on the other hand, the jury were to have concluded that Griffin's wife committed suicide, then Griffin's identity would have been irrelevant, because the crime of murder was not committed. The issue in this case is whether a murder occurred, and not Griffin's identity.

The majority's view that Griffin placed his identity in issue by claiming he did not shoot his wife confuses a plea of not guilty with a genuine issue of identity. And it confuses identity with culpability. There is no dispute about whether Griffin was the individual in the room—any more than about whether his wife was in the room. The issue of identity encompasses only a situation where there is a genuine question whether it was the defendant or another (usually unknown) person who was *present*.

The *Hawn* court was correct that " '[i]dentity is in issue when the fact of the crime is open and evident but the perpetrator is unknown.' "[7] Because the fact of the crime of murder was not open and obvious, but was instead the central issue in this case, I would hold that other-acts evidence purporting to establish Griffin's identity as the murderer was not admissible.

---

7. See *State v. Hawn, supra,* at 462, 741 N.E.2d at 603, quoting *State v. Smith* (1992), 84 Ohio App.3d 647, 666, 617 N.E.2d 1160, 1173, citing *State v. Curry* (1975), 43 Ohio St.2d 66, 72 O.O.2d 37, 330 N.E.2d 720; *State v. Hector* (1969), 19 Ohio St.2d 167, 48 O.O.2d 199, 249 N.E.2d 912; *State v. Shedrick* (1991), 61 Ohio St.3d 331, 574 N.E.2d 1065.