DECISION.
The grand jury indicted defendant-appellant Lamont Smith on three counts of burglary. He appeals from the judgment of conviction entered upon a jury verdict that found him guilty of burglary and attempted burglary. Smith was acquitted of one count of burglary.
The burglary for which Smith was convicted occurred on December 7, 2000. Shirley Evans was returning her young niece to her home, and as the niece entered the apartment and turned on the living-room light, she saw Smith in the apartment. Smith was emerging from one of the bedrooms and walking into the living room. Smith yelled at them. Everyone ran out of the apartment immediately. Smith got within approximately ten or twelve feet of the young niece. Later, she saw that the coins in the cup her mother had used to collect the laundry money were gone and that her mother's red and black duffel bag was on her mother's bed. She identified Smith in court as the person she had seen on December 7 in the apartment, and she had earlier selected his photograph from among those shown to her shortly after the burglary was reported.
Shirley Evans also saw Smith in the living room after she followed her young niece into the apartment. She was within fifteen to sixteen feet and saw Smith's face. Shirley Evans saw her sister's jewelry in the red and black duffel bag and her sister's brown jewelry box on the bed. Several days later, she was shown an array of photographs at her place of business in downtown Cincinnati and picked out Smith within a few seconds. She was also shown a second set of photographs at her house and picked out Smith. She testified that she had never seen Smith on television. At trial, Shirley Evans was absolutely certain that Smith was the man she had seen in the apartment on December 7. Shirley Evans's sister, the mother of the young niece, who arrived home after Smith had fled, saw that only one of three watches she had purchased as Christmas gifts was in the red and black duffel bag. The other two were gone. She had not left the duffel bag sitting on the bed earlier in the day. Her kitchen window latch no longer worked after December 7. A chair was by the kitchen window with a footprint on it that did not belong to anyone who lived in the apartment. She testified that she and her daughter never stood on chairs. She also recognized Smith from having seen him once before when her landlord had needed items hauled away from the apartment building.
Officer Lewis Arnold testified that he found a successful completion form for an electronic monitoring unit ("EMU form") outside the apartment building, after he had concluded his search inside the Evans apartment. He put the EMU form, which included, among other information, Smith's name, in a property envelope and sent it on to Detective Ken Brickler.
Detective Brickler, using information from Smith's EMU form, ordered a photo lineup that included Smith's picture. Detective Brickler testified that the young niece and Shirley Evans took approximately thirty seconds to pick out Smith from among the photographs.
Smith was also convicted of the attempted burglary of Linda Neal's downstairs apartment in a two-family building owned by Betty Nowell, Neal's sister, who resided upstairs. Neal, who lived with other family members, was not at home at the time Smith was first observed by Nowell from upstairs next to a window. The attempted burglary occurred on December 23, 2000. Nowell testified that, having heard noises around 6:15 p.m., she eventually looked outside and saw Smith, who looked up at her, standing near a downstairs window. They stared at each other for approximately fifteen seconds, and Nowell then called for emergency assistance. Thinking Smith had fled, Nowell went downstairs and outside the building only to see Smith again by the same window. She yelled at him and Smith fled. She guessed that he was approximately eight feet away. She could see his face. The window screen had been removed, and the window was broken. In court, Nowell identified Smith as the man she had seen on December 23. Nowell had not seen Smith on television prior to May 7, when she herself had been at the courthouse and had seen a local news station filming, at which time Smith had already been charged with the crimes.
Detective Brickler testified that he showed Nowell two sets of photographs on two different occasions. He testified that she did take longer, but not much longer, than both of the Evanses took before she picked Smith from the two sets of photographs that she was shown. A person living in Nowell's neighborhood was included in the second set of photographs shown to Nowell out of concern that the perpetrator might be a neighbor, who was somewhat similar to Smith in appearance.
In his first assignment of error, Smith claims that he was denied the effective assistance of counsel when his counsel mentioned during voir dire that Smith had prior misdemeanor convictions. To prevail on his claim of ineffective assistance, Smith must first demonstrate that counsel's performance failed to meet an objective standard of reasonable representation.[1] "This requires a showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment."[2] Smith must also show that, as a result of the deficient performance, he suffered prejudice.[3]
Prejudice is demonstrated by a showing of a reasonable probability that, but for trial counsel's deficient performance, the result of the proceeding would have been different.[4]
During voir dire of potential jurors, defense counsel asked, "What do you think about Mr. Smith telling you he has a prior record?" Defense counsel did not provide the potential jurors with details of Smith's criminal history at that time. We will not second-guess what appears to have been a tactical decision made by defense counsel to foreclose the sting of prior convictions when defense counsel anticipated that there was a possibility of their admission at trial. Even if it was unreasonable for defense counsel to anticipate the admission of the prior convictions at trial, Smith still cannot show prejudice. The state's evidence included unequivocal eyewitness testimony of three persons placing Smith at the scene of the crimes for which he was convicted, thus drastically reducing the potential that the jury based its guilty verdicts for two of the three charges Smith faced on the fact that Smith might have had a criminal past. Moreover, the fact that a tactical decision may backfire does not render counsel's assistance constitutionally ineffective.[5] Accordingly, we overrule Smith's first assignment of error.
In his second assignment of error, Smith contends that his conviction should be reversed for prosecutorial misconduct that occurred during the state's cross-examination of him when it asked, "As a matter of fact, you're under felony indictment for failure to pay child support?" The test for prosecutorial misconduct is whether the remarks were improper, and, if so, whether the remarks prejudicially affected the accused's substantial rights.[6] The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor."[7] Clearly the prosecutor's question was improper, but defense counsel immediately objected and the trial court promptly sustained the objection. The trial court also instructed the jury "not [to] speculate as to why the Court sustained the objection to any question or what the answer to such question might have been. You must not draw any inference or speculate on the truth or any suggestion included in a question that was not answered." Thus, although there was an improper question, Smith cannot show prejudice. A jury is presumed to follow instructions given by the trial court.[8] Also, evidence of Smith's guilt was compelling from the testimony of the state's eyewitnesses to the two crimes for which he was convicted. Because we cannot say that the prosecutor's conduct denied Smith a fair trial or materially prejudiced him, we, accordingly, overrule Smith's second assignment of error.
In his third assignment of error, Smith contends that the trial court violated his due-process and equal-protection rights by overruling hisBatson challenge and allowing the state to exclude by use of a peremptory challenge a prospective juror on the basis of race. Batson v.Kentucky[9] prohibits a state actor from engaging in racial discrimination in exercising peremptory challenges, and such discrimination is grounds to reverse a conviction tainted by such discrimination. The Ohio Supreme Court instructs that a court adjudicate a Batson claim in three steps:[10]
 In step one, the opponent of the peremptory challenge at issue must make a prima facie case that the proponent was engaging in racial discrimination. In step two, the proponent must come forward with a race-neutral explanation for the strike. In step three, the trial court must decide, on the basis of all the circumstances, whether the opponent has proved racial discrimination. Purkett v. Elem (1995), 514 U.S. 765, 767-768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834, 839; State v. White, 85 Ohio St.3d at 436, 709 N.E.2d at 147.
 A trial court's finding of no discriminatory intent will not be reversed on appeal absent a determination that it was clearly erroneous.[11] In this case, upon the state's exercise of a second peremptory challenge, its first against an African-American potential juror, defense counsel asked that the state articulate its racially neutral reason for the challenge. The state provided reasons that did not involve race. The record supports the factual basis for the state's legitimate concern about whether the potential juror Magette, based on his confusing answers given to both defense counsel and the state, quite understood what he was being asked and whether he harbored bias against the credibility of a child witness. Thus, we cannot say that the trial court's decision to overrule the Batson challenge was clearly erroneous given the racially neutral reasons for striking Magette. Accordingly, Smith's third assignment of error is overruled.
In his fourth assignment of error, Smith challenges the trial court's decision overruling his motion to suppress identification testimony prior to trial because the identification was the result of an unduly suggestive procedure. To warrant suppression of identification testimony, the accused bears the burden of showing that the identification procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification," and that the identification itself was unreliable under the totality of the circumstances.[12] Even if the procedure itself is suggestive, the challenged identification is admissible as long as it is reliable.[13]
To determine whether identification testimony is reliable, factors to be considered include (1) the opportunity of the witness to view the suspect at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the suspect; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.[14]
Smith argues that no witness was able to observe the burglar for more than a split second, no one provided an accurate description of him, and his photograph was shown on television prior to the identification on at least one news broadcast, so that there was a substantial likelihood of misidentification.
The record shows that no identifying witness saw any news broadcast that would have influenced the identification of Smith when each was presented photographs shortly after the crimes occurred. The EMU form found at the scene of one of the charged crimes was the reason that his photograph was included among the photographs shown to the witnesses. The record lacks evidence of any unduly suggestive procedures on the part of Detective Brickler either in his preparation or in his presentation of the photographs to the witnesses. Having failed to carry his burden of demonstrating unduly suggestive procedures, Smith is raising protests that go merely to the weight of the identification testimony.[15]
Moreover, the descriptions given by the witnesses were sufficiently accurate to demonstrate the reliability of their pretrial identifications. Nowell saw Smith once from her upstairs apartment and then again when she went downstairs to the window where she saw Smith a second time at even a closer distance while he was still trying to break open the window. Both the Evans witnesses saw Smith at close range in the apartment with a living-room light turned on. All the witnesses picked out Smith in a short amount of time when each witness was shown separately all the photographs by Detective Brickler. For these reasons, we hold that Nowell's and the Evanses' pretrial identifications of Smith as the offender were sufficiently reliable to be admissible at trial. Moreover, the jury was fully apprised of the few discrepancies among the descriptions given by the witnesses, but the jury was free to weigh the evidence as it saw fit.[16] Because the record does not support a conclusion that, under the totality of the circumstances, the identification procedures were either unduly suggestive or that they created a substantial likelihood of irreparable misidentification, we, accordingly, overrule Smith's fourth assignment of error.[17]
In his fifth and sixth assignments of error, Smith challenges his convictions on both the sufficiency and the weight of the evidence. The Ohio Supreme Court in addressing sufficiency has stated the following:[18]
 "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following Jackson v. Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781.
To reverse a conviction on the manifest weight of the evidence, a reviewing court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and conclude that, in resolving conflicts in the evidence, the jury clearly lost its way and created a manifest miscarriage of justice.[19] A new trial should be granted only in exceptional cases where the evidence weighs heavily against the conviction.[20]
Smith was convicted of the burglary committed on December 7, 2000, at the Evans apartment, a violation of R.C. 2911.12(A)(1):
No person by force, stealth or deception, shall * * *
 Trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense[.]
In proving the burglary, the state was not required to prove that Smith actually committed a criminal offense inside the apartment.[21]
Smith was also convicted of the attempted burglary, violations of R.C.2923.02 and 2911.12(A)(2), committed on December 23, 2000, when Nowell saw Smith working to remove a window screen on the downstairs apartment of Nowell's family members.
R.C. 2911.12(A)(2) reads, in part,
 (2) Trespass in an occupied structure * * * that is a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present, with purpose to commit in the habitation any criminal offense[.]
R.C. 2923.02 reads in part,
 (A) No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in that offense.
* * *
(E) Whoever violates this section is guilty of an attempt to commit an offense. The Evanses entered the apartment only to find Smith unexpectedly inside, having apparently gained access through a kitchen window. The Evanses immediately ran out and Shirley Evans called for emergency assistance. After hearing noises outside her building, Nowell saw Smith twice within minutes, both times by the same downstairs window trying to break it open before he fled. She also called for emergency assistance. When presented the photographs by Detective Brickler shortly after the crimes occurred, the Evanses and Nowell identified Smith, from among the photographs, as the individual they had seen at the scene of the crimes, and all identified Smith again at trial. The testimony of the eyewitnesses and the law enforcement officers was sufficient to allow a reasonable trier of fact to find all the essential elements of the offenses beyond a reasonable doubt.
Despite some inconsistencies in describing Smith's appearance that may have detracted from the state's case, they were not so persuasive as to render Smith's convictions against the manifest weight of the evidence. The unequivocal testimony of those who were at the crime scenes, observed Smith, and later identified him both for Detective Brickler and again at trial supported the convictions.
In his seventh and eighth assignments of error, Smith claims that the trial court violated his due-process rights by admitting unfairly prejudicial "other acts" evidence at trial and by unfairly limiting his expert's testimony about the psychology of eyewitness identification. Smith challenges the admission of the "other acts" testimony that he had been on an electronic monitoring unit, which later gave rise to the form found outside the Evans residence, and that he had been asked by the prosecutor during cross-examination about being under indictment for failure to pay child support.
In State v. Griffin,[22] this court has stated,
 The threshold question in determining the admissibility of other-acts evidence under Evid.R. 404(B) is whether any of the matters of proof (motive, opportunity, scheme, etc.) are at issue in the case. If not, then other-acts evidence is not admissible, no matter how telling, and regardless of whether an accused's past behavior constitutes a "behaviorist fingerprint."
"Identity is in issue when the fact of the crime is open and evident but the perpetrator is unknown and the accused denies that he committed the crime."[23] Smith himself placed identity at issue when, despite his identification by the state's witnesses, he denied his involvement.
Clearly, the testimony by the state's witnesses about the EMU form with Smith's name on it, which was found on the ground outside the Evans residence after the burglary was reported, addressed the identity issue.
Moreover, the EMU form itself was redacted, in part, before its submission to the jury to ensure that Smith suffered no prejudice. Smith's name on the form resulted in the inclusion of his photograph in the arrays that were presented to the state's witnesses, who were able to identify him as the perpetrator prior to, and again at trial. After reviewing the testimony given by the state's witnesses relative to the EMU form, we conclude that the challenged testimony properly concerned primarily Smith's identity as the perpetrator of the charged crime at the Evans residence.
But we agree that the question put to Smith by the prosecutor about Smith's indictment for failure to pay child support was improper, but we further agree with the trial court's decision to immediately sustain defense counsel's objection. The trial court also instructed the jury "not [to] speculate as to why the Court sustained the objection to any question or what the answer to such question might have been. You must not draw any inference or speculate on the truth or any suggestion included in a question that was not answered." Thus, although there was an improper question asked, Smith cannot show prejudice as the jury is presumed to have followed the instruction given by the trial court.[24]
In the absence of any showing by Smith that he suffered prejudice from the prosecutor's improper question, we overrule the seventh assignment of error.
Concerning the eighth assignment of error, while Smith's eyewitness identification expert, Dr. Solomon M. Fulero, testified at trial, he contends that the expert's testimony was unfairly and prejudicially limited. We disagree and also note that Dr. Fulero's testimony at trial, as it appears in the transcript, spanned ninety pages. Clearly the state's case was based primarily on eyewitness identification, and Smith's identity was at issue. The trial court properly permitted Dr. Fulero to testify at length as to variables that might impair the accuracy of eyewitness identifications, and about what would have been a more appropriate method of presentation of photographic arrays to the eyewitnesses.[25] It should be noted that one variable not mentioned by Dr. Fulero on direct examination but confirmed by him under cross-examination by the prosecutor was that "same-race eyewitness identification rates are more accurate across the charts," and the prosecutor pointed out to Dr. Fulero that this case included a same-race eyewitness identification. After reviewing the wide-ranging testimony given by Dr. Fulero, we cannot say that his testimony was unfairly and prejudicially limited. Accordingly, Smith's eighth assignment of error is overruled.
Having found all of Smith's assignments of error to be without merit, we, accordingly, affirm the judgment of the trial court.
Judgment affirmed.
Doan, P.J., and Gorman, J., concur.
[1] See Strickland v. Washington (1984), 466 U.S. 668, 687-688,104 S.Ct. 2052; State v. Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.
[2] Strickland v. Washington, supra, at 687, 104 S.Ct. at 2064.
[3] See id.; State v. Bradley, supra, at paragraph two of the syllabus.
[4] See id. at 694, 104 S.Ct. at 2068; State v. Bradley, supra, at paragraph three of the syllabus.
[5] See State v. Broadnax (Feb. 16, 2001), 2nd Dist. No. C.A. 18169.
[6] See State v. Lott (1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293, citing State v. Smith (1984), 14 Ohio St.3d 13, 14-15, 470 N.E.2d 883;State v. Twyford, 94 Ohio St.3d 340, 354-355, 2002-Ohio-894,763 N.E.2d 122.
[7] See Smith v. Phillips (1982), 455 U.S. 209, 219,102 S.Ct. 940.
[8] See State v. Garner, 74 Ohio St.3d 49, 59, 1995-Ohio-168, 656 N.E.2d 623.
[9] See Batson v. Kentucky (1986), 476 U.S. 79, 106 S.Ct. 1712; Statev. White, 85 Ohio St.3d 433, 436-438, 1999-Ohio-281, 709 N.E.2d 140.
[10] See State v. Murphy, 91 Ohio St.3d 516, 528, 2001-Ohio-112,747 N.E.2d 765.
[11] See State v. Hernandez (1992), 63 Ohio St.3d 577, 583,589 N.E.2d 1310.
[12] See State v. Jells (1990), 53 Ohio St.3d 22, 27, 559 N.E.2d 464;Neil v. Biggers (1972), 409 U.S. 188, 199, 93 S.Ct. 375.
[13] See State v. Jells, supra, at 27, 559 N.E.2d at 470.
[14] See Neil v. Biggers, supra, at 199, 93 S.Ct. at 375; State v.Davie, 80 Ohio St.3d 311, 321, 1997-Ohio-341, 686 N.E.2d 245.
[15] See State v. Wills (1997), 120 Ohio App.3d 320, 325,697 N.E.2d 1072, discretionary appeal not allowed (1997),80 Ohio St.3d 1409, 684 N.E.2d 703.
[16] See State v. Moody (1978), 55 Ohio St.2d 64, 69,377 N.E.2d 1008.
[17] See State v. Waddy (1992), 63 Ohio St.3d 424, 438,588 N.E.2d 819.
[18] See State v. Twyford, supra, at 354, 2002-Ohio-894, 763 N.E. at 139.
[19] See State v. Thompkins (1997), 78 Ohio St.3d 380, 387,1997-Ohio-52, 678 N.E.2d 541, citing State v. Martin (1983),20 Ohio App.3d 172, 175, 485 N.E.2d 717.
[20] State v. Thompkins, supra, at 387, 1997-Ohio-52,678 N.E.2d at 546-547.
[21] See State v. Brooks (1995), 101 Ohio App.3d 260, 265,655 N.E.2d 418.
[22] See State v. Griffin (2001), 142 Ohio App.3d 65, 72, 753 N.E.2d 967
(citation omitted).
[23] See State v. Griffin, supra, at 73, 753 N.E.2d at 973.
[24] See State v. Garner, 74 Ohio St.3d 49, 59, 1995-Ohio-168, 656 N.E.2d 623.
[25] See State v. Buell (1986), 22 Ohio St.3d 124, 489 N.E.2d 795, paragraph one of the syllabus, certiorari denied (1986), 479 U.S. 871,107 S.Ct. 240.