OPINION.
{¶ 1} In 1999, appellant Joseph Griffin was charged with murdering his wife, Pamela, in violation of R.C. 2903.01(A). The indictment also contained a gun specification. (Because appellant and his murdered wife share the same surname, we refer to them by their first names.) In October 1999, following a jury trial, Joseph was convicted of aggravated murder and the gun specification.
 {¶ 2} In his first appeal to this court,[1] Joseph raised four assignments of error challenging (1) the prosecution's reliance on other-acts and hearsay evidence; (2) remarks made by the prosecution to the jury reflecting upon the evidence and his character; (3) the sufficiency of the forensic evidence to establish that his wife's death was a homicide as opposed to a suicide; and (4) the jury's weighing of the evidence. In March 2001, we held that the jury had been improperly allowed to consider other-acts and hearsay evidence, particularly evidence relating to Joseph's apparent drug and alcohol abuse, his alleged threat to "fucking kill" teenage girls while on drugs, and his alleged threat to kill his wife while holding a knife to her throat.[2]
Applying a harmless-error analysis, we first determined that the errors were of constitutional magnitude.[3] We then looked at whether the errors were harmless beyond a reasonable doubt.[4] We determined that the circumstantial evidence, while compelling, was not so overwhelming that the "extraneous other-acts evidence and impermissible hearsay could not reasonably have influenced the jury's deliberations."[5] Based on this, we held that the admission of such evidence and the prosecution's reliance on that evidence during closing argument had prejudiced Joseph's rights. We, therefore, sustained Joseph's first two assignments of error, found the third assignment to be moot, and overruled the fourth assignment, which challenged the sufficiency and weight of the evidence. Accordingly, we reversed the judgment of the trial court and remanded the case for further proceedings.
 {¶ 3} After a retrial in January 2002, a jury again found Joseph guilty of one count of aggravated murder in violation of R.C. 2903.01(A), with an accompanying gun specification. The trial court sentenced Joseph to life imprisonment with parole eligibility after twenty years for the aggravated murder and to three years for the gun specification. The court ordered the sentences to be served consecutively.
 {¶ 4} In this appeal, Joseph now raises four assignment of error in which he challenges (1) the prosecution's reliance on other-acts evidence; (2) the prosecution's reliance on hearsay evidence; (3) the prosecution's reliance on opinion evidence; and (4) the sufficiency and weight of the evidence to support his conviction. Because we hold that the trial court did not improperly admit other-act, hearsay, or opinion evidence, and because the evidence was sufficient to sustain Joseph's conviction and the conviction was not against the manifest weight of the evidence, we affirm the judgment of the trial court.
 I. FACTS {¶ 5} On September 2, 1998, Pamela was fatally shot in the head in the bedroom of the trailer-park home that she shared with Joseph and their two children. The weapon used was a .38-caliber revolver that Joseph had purchased a few months earlier. The bullet entered Pamela's head under her right ear and lodged in her skull, producing no exit wound. Joseph, who was with his wife at the time of the shooting, placed a call for emergency assistance, telling the operator that his wife had committed suicide after she had loaded the gun. The emergency operator sent an ambulance and attempted to coach Joseph through cardiopulmonary resuscitation.
 {¶ 6} When law enforcement and emergency medical personnel arrived, they observed Pamela lying on the bed, with a weapon next to the left side of her body. Efforts to resuscitate Pamela failed, and she was pronounced dead at the hospital.
 {¶ 7} Upon questioning by the police, Joseph explained that he and Pamela had been paying bills on the morning of September 2, and that he had become upset by Pamela's alleged deception about how much money a friend owed them. He was particularly outraged because he believed that the deception made him look foolish in front of his friend. The couple also took care of other errands that morning, including the purchase of hollow-point bullets for the .38 gun. Upon returning home, Joseph explained, he went to the bedroom to load the gun. Pamela entered the room and they began discussing her deceit. He then described that he went to use the bathroom, and that, upon returning, he came into the hall and observed Pamela holding the gun to her right temple with her right hand. According to Joseph's recollection, Pamela smiled slightly at him and then shot herself, falling onto the bed. Later that day, while at the police station, when asked how Pamela could have shot herself with her right hand when the gun was found near her left side, Joseph changed his story and indicated that Pamela had shot herself in the right temple with her left hand. Joseph also explained that he might have been closer to Pamela than he had originally thought.
 {¶ 8} Homicide investigators were suspicious of Joseph's version of the events. Their suspicions were aroused by the lack of "blow-back" spatter in the bedroom and on Pamela's hands. They reasoned that if Pamela had shot herself by holding the gun in contact with her head, blood should have blown back on her arm in a spatter pattern as the result of pressure expelled through the wound. They also found disturbing the actual spatter of blood they detected on Joseph's shirt. Investigators also could not reconcile the placement of the gun on the left side of Pamela's body with the location of the bullet wound under her right ear. Finally, Joseph's own statements also aroused the investigators' suspicions, particularly the change in his statement about which hand Pamela had used to shoot herself and the way he became agitated every time he talked about how Pamela had lied to him about the money exchange with his friend.
 {¶ 9} Subsequent investigation revealed that Joseph had purchased a lethal type of bullet referred to as a "hollow point" on the day of his wife's shooting. Further investigation revealed that Joseph had been unemployed due to an industrial accident, and that while Joseph had been on disability, Pamela had worked as a nurse's aide at Riverview Nursing Home. According to her coworkers, Joseph was mistrustful of Pamela and made frequent calls to her while she was at work. Pamela was, according to her coworkers, scared of Joseph, would cry at work, and had often been seen with bruises on her arms and legs. One coworker, Kimberly Wesley, testified that Pamela had told her that Joseph had threatened to kill her. Loretta Couch observed a mark on Pamela's face one month before her death, and, upon questioning by the coworker, Pamela commented that Joseph had smacked her and that Joseph was going to "kill her." Yet another coworker, Lois Lunsford, testified that Joseph had suspected Pamela of having an affair with someone at work.
 {¶ 10} Two days before Pamela's death, Joseph was discovered at the nursing home going through the time cards. According to Sandy Marsh, Pamela came downstairs to meet Joseph and asked to leave early. Pamela was given permission to leave, and as they were walking out the door, Joseph announced that "Pamela will no longer work here. He walked out [the] door [and] peeked his head back in and he said: As a matter of fact, you'll never see her again." Pamela called in sick for work the next day (September 1), and Patricia Boertlein overheard Joseph in the background say to Pamela, "[G]et off the phone now, bitch, or I'll kill you."
 {¶ 11} Neighborhood witnesses testified that Pamela and Joseph fought frequently after he became disabled and that Pamela was concerned for her own safety. Tabitha Kroger, the babysitter, testified that she had observed Pamela and Joseph getting into a fight over money about one week prior to Pamela's death. During the argument, Kroger observed Joseph pull out his gun and load it, and he then broke a lamp. With that, Kroger left. The following day, Pamela went to Kroger's house after another heated argument with Joseph, and according to Kroger, Pamela was terrified that Joseph would kill her. Other neighbors, Tammy Vinson, Mildred Kleintank, Patricia Wert, and Pamela's counselor, Karyn Rosenfeld, testified that Joseph and Pamela frequently fought and that Joseph had physically abused Pamela, one time threatening to kill her while brandishing a gun.
 {¶ 12} At trial, Joseph's defense relied on the assertion that Pamela had committed suicide. A highly qualified expert in blood spatter disputed the prosecution's theory that the absence of blow-back spatter confirmed a homicide. The expert testified that he had produced experimental support for the defense theory that the blood on Joseph's shirt had been expirated by Pamela during CPR. Joseph also presented family witnesses who testified that Pamela had been suicidal and that she knew how to shoot a gun with both hands.
 II. ADMISSION OF EVIDENCE {¶ 13} The first three assignments of error relate to the admission of certain other-acts, hearsay, and opinion testimony. At the outset, we note that the admission or exclusion of evidence ordinarily rests within the sound discretion of the trial court.[6] An "abuse of discretion" by the trial court means more than an error of law or judgment; rather it implies that the court's attitude is "unreasonable, arbitrary, or unconscionable."[7] An error in an evidentiary ruling does not warrant reversal of the trial court's judgment unless the ruling affected the substantial rights of the complaining party.[8] It is this standard that governs our review of the first, second, and third assignments of error.
A. Other Acts of Violence by Joseph Toward the Victim
 {¶ 14} In the first assignment of error, Joseph argues that the trial court improperly allowed the prosecution to present other-acts evidence. He maintains that evidence of prior acts of domestic violence and threats to kill the victim were not temporally related to Pamela's death and were elicited only to show Joseph's propensity for committing the crime.
 {¶ 15} Generally, evidence of other crimes, wrongs, or acts is not admissible to prove the character of the person in order to show that he acted in conformity therewith.[9] However, Evid.R. 404(B) creates an exception for the admission of other-acts evidence when that evidence is used as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."[10] Other-acts evidence is admissible where it is probative of certain matters genuinely in issue and temporally and circumstantially connected to the operative facts of the offense.[11] The admission of other-acts evidence must be conservative.[12]
 {¶ 16} At trial, the prosecution elicited testimony from neighbors at the trailer park where the couple lived, who had personally observed Joseph either physically assault or threaten to kill his wife in the weeks before her death. The state argues that the admission of such evidence was proper to show Joseph's identity as the killer. We agree.
 {¶ 17} Joseph's defense was that Pamela committed suicide. Essentially, his argument was that someone else did the shooting. By denying his involvement in Pamela's death, Joseph put identity in issue in this case.
 {¶ 18} We held in our first decision that where a defendant charged with murder admits to being the only other person present when the events occurred and puts forth the issue of whether the victim committed suicide, the identity of the defendant is at issue and other-acts evidence may be introduced.[13] Specifically we stated the following in our first decision:
 {¶ 19} "We respectfully disagree with the Second District Court of Appeals on this issue. The court's analysis, in our view, errs by concluding that in a murder or suicide case the defendant is the only suspect. As we have noted, in our view there are two suspects — the defendant and the victim. While it is true that only one of the suspects, the defendant, can be found guilty of murder, evidence of suicide creates a genuine issue concerning the identity of the person who pulled the trigger. Thus, we believe that, in a case such as this, and inHawn, evidence of other acts of domestic violence, particularly those involving the same gun used in the killing, and occurring within the same time period as the shooting, should be admissible under Evid.R. 404(B) to establish the identity of the shooter."[14]
 {¶ 20} Kroger, Tammy Vinson, and Wert testified to other acts in which Joseph had threatened to kill his wife with the same gun, and had physically abused Pamela. This was circumstantial evidence used to identify him as the killer. We hold that such episodes, occurring several weeks before her death, were sufficiently connected in a temporal sense to the facts of Pamela's death to be probative of the identity of the shooter.
 {¶ 21} The prosecution also elicited testimony from two coworkers: Couch and Boertlein. Couch testified that she had personally observed injuries to Pamela about one month before her death and learned from Pamela that Joseph had caused the injuries; and Boertlein testified that she had overheard Joseph tell Pamela on the phone on August 31, 1998, that if Pamela did not get off the phone he would "kill her."[15]
While the state offered no reason for this testimony, we hold that these statements also related to the issue of identity. Evidence of other acts that Joseph had physically threatened Pamela and threatened to kill Pamela in the weeks before her death was probative of the issue of the identity of Pamela's shooter and temporally related to the facts of Pamela's death.
 {¶ 22} Finally, the prosecution introduced testimony from Pamela's "job's counselor" at the Department of Human Services. The counselor had worked with Pamela for three years between 1993 and 1996, and had helped Pamela get a GED and a job. The disputed testimony related to the counselor's recollections that she had observed injuries to Pamela caused by Joseph and that Pamela was fearful that her husband would kill her. The state did not provide any reasons why this testimony was admissible.
 {¶ 23} Arguably the testimony was probative of identity, but it does not appear, at first glance, to be temporally related to the facts of Pamela's death, because the counselor last saw Pamela in 1995 (though she spoke with Pamela on the phone twice in 1996). In our view, the testimony was probative and temporally and circumstantially related to the crime. The counselor's testimony recounted situations where Joseph was believed to have abused Pamela and Pamela was fearful of her life. Much of the testimony presented by the prosecution throughout the trial indicated that Joseph had been an abusive husband and that the instances of abuse intensified as the day of Pamela's death approached. The counselor's testimony aptly demonstrated that fact by showing that instances of domestic violence between Pamela and Joseph had occurred as early as 1993 and had escalated from that time until the time of Pamela's death.
 {¶ 24} Even if we were to hold that the testimony did not qualify for admission under Evid.R. 404(B), any error in admitting the testimony was harmless. The statements standing alone did not implicate a particular constitutional protection, and a review of the record reveals substantial other evidence supporting the guilty verdict.[16]
Accordingly, the trial court did not err in admitting the other-acts testimony, and we overrule the first assignment of error.
B. Hearsay Testimony About the Victim's Then-Existing State of Mind.
 {¶ 25} In his second assignment of error, Joseph contends that the trial court erroneously admitted into evidence hearsay statements from Pamela's neighbor, three coworkers, and her former counselor concerning Pamela's fear of her husband or fear that he would kill her.[17]
Specifically, he points to instances where witnesses supposedly testified about the facts underlying Pamela's then-existing state of mind.
 {¶ 26} Hearsay evidence is generally not admissible to prove the truth of the matter asserted.[18] Evid.R. 803(3) sets forth an exception to hearsay by allowing testimony as to the declarant's then-existing mental or physical condition. Hearsay testimony is admissible, therefore, if it is limited to a reflection of the state of mind of the victim and does not provide the reasons underlying that state of mind.[19] Moreover, the testimony should be limited to contemporaneous declarations of feeling or intent because the testimony sought to be introduced must point forward in time rather than to events in the past.[20]
 {¶ 27} Having reviewed the challenged statements, we first note that, as for Boertlein's testimony, she did not impermissibly refer to hearsay declarations of the victim at any point during her testimony. With respect to the instances of hearsay testimony introduced by a friend (Kroger), two coworkers (Couch and Meyer), and the counselor (Rosenfeld), we conclude that their statements were relevant and fell within the Evid.R. 803(3) exception. The victim made the statements at a time that reflected her then-existing state of mind: that she was fearful of Joseph and that he might kill her. Moreover, by carefully circumscribing the questions asked of those witnesses, the prosecutor took the appropriate steps to ensure that the witnesses testified only about Pamela's fear of her husband and not about the basis of that fear. Thus, the trial court did not err in admitting this testimony, and we overrule the second assignment of error.
C. Opinion Testimony of Lay Witnesses
 {¶ 28} In the third assignment of error, Joseph argues that the trial court improperly allowed opinion testimony from lay witnesses, including coworkers, neighbors, and the job counselor, about Pamela's mental state, that the court improperly permitted opinion testimony from an investigating officer, and that the court improperly allowed opinion testimony from an emergency medical technician ("EMT").
 {¶ 29} Evid.R. 701 permits lay witnesses to express opinions that are (1) rationally based on the witness's firsthand perception or knowledge of the subject, and (2) helpful to a clear understanding of the testimony or to the determination of a fact in issue.[21] To satisfy the first requirement, the opinion of the lay witness must be what a rational person would form on the basis of the observed facts,[22] and to satisfy the second requirement, the lay witness's opinion "must assist the trier of fact in understanding the testimony of the witness or in determining a fact in issue."[23] With these constraints, a lay witness may testify about another's emotional state, physical condition or sanity.[24]
 {¶ 30} First we address the opinions of Hammons, Kroger, Cathy Vinson, Couch, Wesley, Meyer, and Rosenfeld that Pamela was not suicidal. Their testimony was based upon facts that they had individually observed, and we are convinced that the opinions were consistent with what a rational person would have formed given similar observations and facts. The witnesses based their testimony on their relationship with Pamela, their familiarity with Pamela, and their observations of Pamela's personal relationships. (Hammons, Pamela's sister, spoke with Pamela at least once a month; Kroger babysat frequently for the Griffins; Cathy Vinson, a neighbor, saw Pamela and her family daily; Couch was in charge of supervising Pamela's work and work schedule; Wesley and Meyer worked with Pamela nearly every day and considered Pamela to be a friend; and Rosenfeld helped counsel Pamela about her personal and professional development.) Further, all the testimony related solely to their perception of Pamela's mental state, rather than to the underlying reasons for her mental state. Second, the testimony was relevant to the issues at hand, namely to refute Joseph's defense that Pamela had committed suicide. Accordingly, we conclude that the trial court did not abuse its discretion in considering their opinions and finding that the requirements of Evid.R. 701 had been met.
 {¶ 31} Next, we address the introduction of evidence from an investigating police detective, Jerry Diersing. Joseph contends that the trial court erred in permitting opinion testimony relating to how a person who has just lost a loved one would act under similar circumstances. Detective Diersing testified that he arrived at the Griffin's home soon after the shooting. He testified that there were several reasons why he did not believe Joseph's version of the events, i.e., that Pamela had committed suicide. One reason provided by Detective Diersing was that Joseph appeared very calm, which was, in his opinion, not consistent with a person who had just lost a loved one.
 {¶ 32} Detective Diersing testified that, at the time of the trial, he had recently retired from the police force. He had worked for thirty-three years as a police officer, and he was a homicide detective for twenty-five of those years. He testified that he had been involved in too many homicide cases to count and that he was regularly required to form opinions about how a homicide had occurred when conducting an investigation. Detective Diersing testified that, in his opinion, Joseph did not behave in a manner consistent with someone who had just lost a loved one. Based on Detective Diersing's foregoing testimony, his observations of Joseph, and the usefulness of the testimony in determining a fact in issue, we hold that it was proper for the trial court to allow Detective Diersing's opinion testimony relating to Joseph's behavior immediately following his wife's death pursuant to Evid.R. 701.
 {¶ 33} Joseph also contends that the trial court erred in permitting Detective Diersing's testimony that the blood on Joseph's shirt was consistent with "blow-back" spatter from a gunshot wound. No objection was made to the introduction of this evidence.
 {¶ 34} Failure to object to the admission of evidence at trial constitutes a waiver of any objection upon appeal.[25] However, we must still consider whether plain error occurred.[26] In order to have plain error, there must be an error, the error must be an "obvious" defect in the trial proceedings, and the error must affect "substantial rights."[27] Plain error is to be used "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice."[28]
 {¶ 35} Detective Diersing's testimony relating to the blood on Joseph's shirt came while he was explaining what evidence led him to disbelieve, based upon his investigation, Joseph's story that Pamela had committed suicide. As we have already stated, Detective Diersing had personal knowledge of the investigation and was competent to testify about the meaning he attributed to the way the blood on Joseph's shirt looked. The evidence was also helpful in explaining his reasons for investigating Joseph as a suspect. Also, Joseph had the opportunity to cross-examine Detective Diersing about his interpretations. Finally, Detective Diersing's testimony was merely cumulative of the testimony given by the state's expert witness on blood spatter, who had stated that the blood on Joseph's shirt was consistent with "blow-back" spatter caused by a gunshot wound. The defense also put forth its own blood-spatter expert who refuted the state's expert by stating that "blow-back" spatter did not occur in all cases, particularly where hair might impede the projection of the blood. The defense expert concluded that the blood on Joseph's shirt could have instead been attributed to expiratory blood (which would have supported Joseph's defense that he had spat out Pamela's blood onto his shirt after unsuccessfully attempting CPR on Pamela). Accordingly, we find no error, plain or otherwise, in admitting the detective's testimony.
 {¶ 36} Finally, Joseph contends that the trial court erred in admitting Detective Diersing's opinion testimony concerning studies performed on women who had committed suicide. This testimony was elicited by the defense on cross-examination, so Joseph cannot now claim error for that which he induced.
 {¶ 37} Last, we address Joseph's challenge on appeal to the introduction of opinion testimony from Lieutenant Bittner. Bittner, an EMT with the Whitewater Township Fire Department, responded to the Griffin's house immediately following the shooting. She later returned to the Griffin's home to pick up some medical equipment left behind after Pamela was taken to the hospital. While there, Bittner and her husband, also a lieutenant with the Whitewater Township Fire Department, expressed their sympathies to Joseph. In response, Joseph, according to Bittner, "began to cry and sob, but there were no tears. And I found that to be a little strange. [Because] in my experience, most people, when they get that upset, they just really break down and really sob." No objection was raised by the defense.
 {¶ 38} In the absence of an objection to this testimony, we address it under a plain-error standard. Not only do we find no plain error here, but we also hold that Bittner's testimony was admissible as opinion testimony pursuant to Evid.R. 701, because it was based on her personal observations of Joseph and helpful in determining a fact in issue, i.e., Joseph's strange reaction following his wife's death.
 {¶ 39} Finally, Joseph contends that even if the testimony complained of here was admissible under Evid.R. 701, it was not relevant under Evid.R. 401, and that the likelihood of prejudice substantially outweighed it probative value under Evid.R. 403. Once again, we are mindful that the admission or exclusion of relevant evidence generally rests in the sound discretion of the trial court.[29] We have already held that the testimony was helpful to a determination of an issue, and, therefore, relevant. And, based on our review of this trial, we hold that the testimony was similarly not unduly prejudicial. Accordingly, we overrule the third assignment of error.
 III. WEIGHT AND SUFFICIENCY OF EVIDENCE {¶ 40} In his fourth assignment of error, Joseph challenges the weight and the sufficiency of the evidence used to obtain his conviction. Joseph contends that the jury lost its way because the forensic evidence supported his defense that Pamela had committed suicide and that the jury was improperly influenced by hearsay and other-acts evidence portraying Joseph as a violent and jealous husband.
 {¶ 41} At the outset, we note that, having already determined that the other-acts and hearsay testimony was properly admitted, we reject Joseph's argument that such testimony improperly influenced the jury.
 {¶ 42} When reviewing the sufficiency of the evidence to support a criminal conviction, we must examine the evidence admitted at trial in the light most favorable to the prosecution and determine whether such evidence could have convinced any rational trier of fact that the essential elements of the crime had been proved beyond a reasonable doubt.[30] In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of the witnesses, as both are functions reserved for the trier of fact.[31] In contrast, when reviewing the weight of the evidence, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and decide whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created a manifest miscarriage of justice.[32] A new trial should be granted only in exceptional cases where the evidence weighs heavily against conviction.[33]
 {¶ 43} Joseph was convicted of aggravated murder in violation of R.C. 2903.01(A), with an accompanying gun specification. R.C. 2903.01(A) provides, "No person shall purposely, and with prior calculation and design, cause the death of another * * *."
 {¶ 44} Direct evidence, circumstantial evidence, or both may establish an element of the charged offense.[34] Circumstantial and direct evidence are of equal evidentiary value.[35] Here, there were two components to the evidence presented at trial: direct evidence, in the form of forensic evidence, and circumstantial evidence, in the form of physical abuse and threatening behavior by Joseph. Based on the record, we are persuaded that sufficient evidence was presented that Joseph killed Pamela and that he had the requisite criminal intent.
 {¶ 45} As direct evidence that Joseph had killed Pamela, the prosecution highlighted the placement of the gun by the left side of the bed as particularly troubling in light of the fact that the wound was on the right side of her head near the back of the ear. The prosecution suggested that the location of the wound on the right side of the head with the gun lying on her left side indicated that Pamela could not have shot herself. Also, no markings were found on Pamela's thumb to suggest that she had pulled the gun's trigger. And the prosecution presented evidence suggesting that there had been a physical struggle between Pamela and Joseph before the fatal shot was fired. (A pathologist testified that a small cut on Pamela's lip was not self-inflicted; bruises on Pamela's body were noted on the autopsy report; and some of the blood found on Joseph's shirt was a mixture of blood from Joseph and Pamela.)
 {¶ 46} As circumstantial evidence of Joseph's involvement, the prosecution highlighted, as evidence that Joseph had shot Pamela, the fact that Joseph had been relatively calm after his wife's death and that Joseph had changed his story several times, particularly as it related to who had loaded the gun, how close he had been when Pamela allegedly pulled the trigger, and which hand Pamela had allegedly used when pulling the trigger.
 {¶ 47} Second, circumstantial evidence was presented of Joseph's intent to kill his wife, particularly his abusive and threatening behavior towards his wife immediately before she died. Witnesses testified that Joseph had physically assaulted and threatened to kill his wife in the days and weeks before her shooting. It is clear, on the evidence in this record, that Joseph was a physically abusive and jealous husband. There was testimony from Pamela's coworkers that Joseph had repeatedly called Pamela at work to confirm her whereabouts and that Pamela often had visible bruises on her arms and legs. At Pamela's funeral, Joseph apparently confronted one coworker about a potential affair between his wife and another man. Perhaps most damaging of all was Joseph's behavior in the few days before Pamela's death. Two days before the shooting, Joseph was seen going through employee time cards at Riverview (Pamela's place of employment), and when he was asked to leave, he commented, "You'll never see her [Pamela] again."
 {¶ 48} Other circumstantial evidence of Joseph's intent to kill Pamela was the fact that, on the morning of her death, Joseph had purchased lethal "hollow point" bullets and that Joseph had loaded the gun while at home in their bedroom minutes before Pamela's death. Joseph attempted to counter this evidence by presenting the testimony of his father, who stated that he had recently advised Joseph to procure a different type of ammunition after Joseph had complained about a lack of accuracy during target practice. The prosecution also elicited testimony from the deputy coroner that, approximately ten days after his wife's death, Joseph had called the coroner's office and requested his gun and bullets back because they could "kill" somebody. The deputy coroner further testified that Joseph had commented on the fact that he thought his wife had been having an affair before her untimely death.
 {¶ 49} Both the prosecution and the defense hotly debated the direct evidence, particularly the "blow-back" spatter and gunshot residue. The prosecution relied on the absence of "blow-back" spatter on Pamela's arms and hands and the surrounding wall and lamp to show that if Pamela had held the gun to her head as Joseph described, blood and other viscera should have come out of her wound and spattered on or around her. The prosecution maintained that the presence of a light spattering of Pamela's blood on the left shoulder of Joseph's shirt was, in fact, "blow-back" spatter from Pamela, thus establishing that Joseph had been the one who had fired the gun. The prosecution's blood-spatter evidence suggested that the pattern found on the left shoulder of Joseph's shirt indicated that he was close to Pamela when she was shot. In response, Joseph presented an expert in blood spatter who testified that "blow-back" spatter would not necessarily have been present in all cases of contact gunshot wounds. The expert reasoned that hair might, for example, reduce the presence of "blow-back" spatter. Further, Joseph argued that the blood on his shirt was the result of an attempt at CPR on Pamela, and the expert confirmed that the spatter on Joseph's shirt could have been caused by expiration. Additionally, Joseph pointed to the evidence of blood around Pamela's mouth and nose and his own emergency call for assistance to support his contention. The prosecution's blood-spatter expert, however, testified that the blood spatter on Joseph's shirt could not possibly have been expirated blood, because she did not detect any mucus on the blood spots, which she claimed would have been present if the blood had been transferred orally. Further, the prosecution maintained that while Joseph may have in fact wiped his mouth on his shirt after attempting CPR, he had told the police that he had wiped his mouth on the right side of his shirt, not the left where the blood spatter was found.
 {¶ 50} Also, both sides attempted to explain the gunshot residue found on both of Pamela's hands (particularly the left) and the absence of such residue on Joseph's hands. Joseph maintained that this evidence supported his suicide defense, while the prosecution maintained that Joseph had ample opportunity to wash his hands or to rub off the gun-shot residue, and that he (unlike Pamela) had blood on his hands.
 {¶ 51} We conclude, after viewing the evidence presented at trial, including all reasonable inferences, in a light most favorable to the prosecution, that a rational trier of fact could have found that the prosecution had proved the elements of prior calculation and design beyond a reasonable doubt.
 {¶ 52} Finally, we are unconvinced that the jury improperly weighed the evidence. The jury apparently found the testimony of the state's witnesses, including the prosecution's blood-spatter expert, the investigating police officers, the emergency medical technicians, the deputy coroner, the neighbors, and Pamela's coworkers, to be more credible than the testimony of Joseph's blood-spatter expert and his father. Because the weight to be given the evidence and the credibility of the witnesses were primarily for the trier of fact,[36] we cannot say that, as a matter of law, the jury improperly weighed the evidence. We therefore hold that the jury did not lose its way in finding Joseph guilty. Accordingly, we overrule the final assignment of error.
 IV. CONCLUSION {¶ 53} In light of our analysis, we conclude that the trial court did not err in admitting certain other-acts evidence concerning domestic violence and threats to kill the victim because it was probative of identity and temporally and circumstantially connected to the operative facts. Further, the trial court did not err in permitting hearsay statements of the victim relating to her fear of her husband or her fear that he would kill her. The statements reflected the victim's then-existing state of mind, and the required steps were taken to ensure that the witnesses did not testify to the facts forming the basis of the victim's fear. Third, we conclude that the trial court did not err in permitting opinion testimony of lay witnesses, including (1) coworkers, neighbors, and a counselor testifying about Pamela's mental state; (2) an investigating police officer testifying about Joseph's behavior and whether the blood on Joseph's shirt was consistent with "blow-back" spatter; and (3) an EMT testifying about Joseph's behavior after his wife's untimely death. Finally, we conclude that there was sufficient evidence to support Joseph's conviction, particularly in light of the circumstantial evidence highlighting Joseph's abusive and jealous behavior towards his wife and his premeditated intent to kill her, and that the jury's finding of guilt was not contrary to the weight of the evidence. As a result, we affirm the judgment of the trial court.
Judgment affirmed.
Gorman, J., concurs.
Painter, P.J., dissents.
[1] See State v. Griffin (2001), 142 Ohio App.3d 65, 753 N.E.2d 967
(Painter, J. concurring separately).
[2] See id. at 79.
[3] See id.
[4] See id.
[5] Id. at 85.
[6] See State v. Sage (1987), 31 Ohio St.3d 173, 510 N.E.2d 343, paragraph two of the syllabus.
[7] Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219,450 N.E.2d 1140.
[8] See Evid.R. 103.
[9] See Evid.R. 404(A).
[10] Evid.R. 404(B). See, also, R.C. 2945.59.
[11] See State v. Griffin, supra, at 72, quoting State v. Hawn
(2000), 138 Ohio App.3d 449, 462, 741 N.E.2d 594.
[12] See id.
[13] See id. at 73. But, see, State v. Griffin, supra (Painter, J., concurring) (rejecting the court's ruling that other-acts evidence was admissible).
[14] Id. at 74.
[15] In this appeal, counsel for Joseph cites only to the page numbers containing testimony for each incident. Upon reviewing the alleged violations, we note that, with respect to Boertlein's testimony, no other-acts testimony was admitted on the page cited in the brief. We, however, believe the citation was a misprint and was intended to address Boertlein's testimony relating to a phone conversation between Pamela and Joseph.
[16] See id. at 79, citing State v. Webb (1994), 70 Ohio St.3d 325,335, 638 N.E.2d 1023.
[17] As we discussed earlier, Joseph's brief contains only references to page numbers in the transcript when identifying an alleged error. We believe the citation given in this instance was a misprint and address the hearsay evidence relating to a phone conversation.
[18] See Evid.R. 801(C).
[19] See State v. Apanovitch (1987), 33 Ohio St.3d 19, 21,514 N.E.2d 394.
[20] See id. at 21-22.
[21] See Lee v. Baldwin (1987), 35 Ohio App.3d 47, 49,519 N.E.2d 662.
[22] See State v. Kehoe (1999), 133 Ohio App.3d 591, 603,729 N.E.2d 431.
[23] Id., quoting State v. Sibert (1994), 98 Ohio App.3d 412, 426,648 N.E.2d 861.
[24] See State v. Sibert, supra, at 426.
[25] See Evid.R. 103(A)(1).
[26] See Evid.R. 103(D); Crim.R. 52(B).
[27] State v. Barnes, 94 Ohio St.3d 21, 28, 2002-Ohio-68,759 N.E.2d 1240.
[28] Id., quoting State v. Long (1978), 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph three of the syllabus.
[29] See State v. Sage, supra.
[30] See State v. Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-52,678 N.E.2d 541; State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, superseded by state constitutional amendment on other grounds in State v. Smith, 80 Ohio St.3d 89,1997-Ohio-335, 684 N.E.2d 668.
[31] See State v. Willard (2001), 144 Ohio App.3d 767, 777-778,761 N.E.2d 688.
[32] See State v. Thompkins, supra, at 387.
[33] See id.
[34] See State v. Durr (1991), 58 Ohio St.3d 86, 92, 568 N.E.2d 674.
[35] See State v. Jenks (1991), 61 Ohio St.3d 259, 272, 574 N.E.2d 492, paragraph one of the syllabus, superceded by state constitutional amendment on other grounds in State v. Smith, 80 Ohio St.3d 89,1997-Ohio-335, 684 N.E.2d 668.
[36] See State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus.