JOURNAL ENTRY AND OPINION
{¶ 1} A jury found defendant Terrence Collymore guilty of murder, in violation of R.C. 2903.01. Collymore appeals, and of eight assignments of error most strenuously argues that the court erred by allowing into evidence testimony relating to the victim's state of mind.
 {¶ 2} The state built its case entirely on circumstantial evidence. The victim and her three children lived in one-half of a duplex; her mother and the mother's son lived in the other half. In addition to sharing a house, the victim and her mother both worked for the same counseling center. On the morning of December 17, 2001, the victim had the day off and intended to do some shopping, so her mother drove the children to daycare before proceeding on to her job. After leaving the children and continuing on to work, the mother used her cell phone to call the victim. She made the call at about 9:20 a.m. and spoke to the victim for fifteen to twenty minutes. The victim said that she intended to finish her Christmas shopping that day and organize gifts for her children.
 {¶ 3} That same day, as the mother returned from her lunch break, she received a telephone call from a grocery store on the eastside of Cleveland. The store employee said that a black male, later identified as Collymore, had tried to cash the paycheck of one of the counseling center's employees. The employee said that he had previously cashed a check made out to the victim, but that payment on the check had been stopped and he was left with a $700 loss. The employee took possession of the check and told Collymore that he would not return the check until the first check had been made good. Using the telephone directory, the employee found the telephone number of the counseling center and called to verify the check. When the mother recalled that the counseling center had recently stopped payment on a paycheck written to the victim, she immediately called the victim. When the victim inexplicably failed to answer repeated calls to her cell phone, the mother called her son and asked him to go into the victim's apartment. The son found the victim dead.
 {¶ 4} The victim had been strangled. She was fully clothed and lying on her bed amid Christmas presents for her children. The police found no sign of forced entry or sexual assault. There appeared to be nothing taken from the apartment, although the police could not locate the victim's cell phone and her car keys. The trace evidence showed no physical evidence relating to Collymore.
 {¶ 5} Collymore and the victim had been involved in a relationship several years before her death. They had a child from that relationship. Although no longer involved with the victim, Collymore would visit his daughter and the victim from time to time, always driving a silver car that belonged to his mother. On the day of the murder, a neighbor said that he saw Collymore's silver car parked near the victim's house between 11 and 12 o'clock in the morning.
 {¶ 6} A videotape taken from inside the grocery store proved that Collymore was the person who tried to cash the victim's paycheck on the day of the murder. Knowing this, the police brought Collymore in for questioning and, before showing him the videotape, asked him questions about his activities on the day of the murder and when he had last seen the victim. A "cocky" Collymore insisted several times that he had not seen the victim for at least ten days. Collymore's attitude changed abruptly upon seeing himself in the videotape. A "visibly shaken" Collymore admitted that he had taken the victim's paycheck, but said that he did so two weeks before the date of the murder. When confronted with the actual issue date of the check, Collymore asked the police when they had found the victim. When told it had been December 17, he changed his story and said that he had taken the check on either December 14 or December 15. Upon further questioning, Collymore said that he was positive that he took the check on December 15 — he recalled that he and a companion visited the victim at around 7:00 p.m. and played with his child. He said that he saw the check on a table and took it when the victim was not looking.
 {¶ 7} Collymore's story about visiting the victim on December 15 at 7:00 p.m. was flatly contradicted by a witness who claimed that she and the victim had catered a party that evening. The party had been scheduled to start at 7:00 p.m. and the victim picked up the witness at 6:45 p.m.
 {¶ 8} Collymore denied that he had been to the victim's house on the day of the murder. He said that he had reported to his job as a roofer that morning, but rain postponed the scheduled job. He then went to his house and, with the help of a neighbor, worked on his car. The police were unable to confirm this story, however, as Collymore's boss said that Collymore did not report for work that morning as he had called in on a cell phone and been told that work on the roof had been cancelled due to the weather. Likewise, the neighbor who allegedly worked on Collymore's car denied seeing Collymore on the day of the murder.
 {¶ 9} Collymore's insistence that he had not been at the victim's house on the day of the murder was contradicted by the testimony of one of the victim's neighbors. The neighbor said he knew what kind of car Collymore drove and that at around 11:00 a.m. he saw that car parked outside the victim's house on the day of the murder.
 {¶ 10} Finally, the state offered the testimony of Collymore's cellmate from the county jail. The cellmate said that he had a conversation with Collymore in which he asked Collymore if he had committed the murder. He said that Collymore said "yeah, but." The cellmate was unable to clarify the "but" in Collymore's statement, although the cellmate sensed that Collymore had not intended to murder the victim.
 {¶ 11} Collymore offered the testimony of two witnesses, neither of whom could give him an alibi for probable time of the murder. The first defense witness was a high school student with whom Collymore had started a sexual relationship. She said that Collymore picked her up from Rhodes High School on Cleveland's westside a few minutes after 12:30 p.m. and took her back to his house on the eastside. They played video games for a while and he returned to school at 1:15 p.m.
 {¶ 12} The second defense witness was Collymore's aunt who testified that she saw Collymore at 2:15 p.m. on the day of the murder.
 I {¶ 13} During the trial, the court allowed the state to call as witnesses two friends of the victim who said that the victim feared Collymore and wished to move to a new house in order to escape his threats. These witnesses said that the victim told them that Collymore had grabbed her neck and said that if he found her with another man he would kill them. A third witness had been told by the victim that Collymore purposely caused bruising on the victim's arm and neck so that other men would leave her alone. Collymore argues that the court erred by admitting this testimony in violation of the law set forth in State v.Apanovich (1987), 33 Ohio St.3d 19.
 {¶ 14} All of the contested statements were hearsay, as they were out-of-court statements offered to prove the truth of the matter asserted. See Evid.R. 801 and 802. As a basic matter, the admission of hearsay could be said to be a violation of the right to confrontation since the party against whom the statement is offered would be unable to cross-examine the declarant in the face-to-face manner anticipated by theSixth Amendment to the United States Constitution and made applicable to the states through the Fourteenth Amendment. Even though the use of hearsay predates the framing of the Constitution, there is "little doubt, however, that the Clause was intended to exclude some hearsay." See Roberts v. Ohio (1980), 448 U.S. 56, 63. To resolve this tension, the United States Supreme Court has held that the Confrontation Clause is not violated when the declarant is unavailable and the hearsay falls within a "firmly rooted exception." White v. Illinois (1992), 502 U.S. 346, 356. Those exceptions have been codified in the Ohio Rules of Evidence. As applicable here, the relevant exception is Evid.R. 803(3), which permits, as an exception to the hearsay rule:
 {¶ 15} "A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."
 {¶ 16} Apanovitch presented a fact pattern somewhat similar to this case in that the state lacked any physical evidence to tie Apanovitch to a murder. The state relied on circumstantial evidence showing Apanovitch's knowledge of the victim and her house (he had been hired by the victim to paint her house), his suspicious means of establishing an alibi (witnesses contradicted him on his whereabouts) and statements made by the victim to her friends to the effect that she had been fearful and apprehensive about the man painting her house because he had made sexual advances to her. The statements attributed to the victim did not identify Apanovitch by name, but referred to him as the painter or the "big man," in reference to his physical size.
 {¶ 17} After citing to Evid.R. 803(3), the supreme court discussed the application of United States v. Cohen (C.A. 5, 1980), 631 F.2d 1223, in which the Fifth Circuit Court of Appeals admitted into evidence out-of-court statements Cohen had made to the effect that he was scared, anxious, or in any other state reflecting his then existing mental or emotional condition. The supreme court stated:
 {¶ 18} "However, the court also observed that the state-of-mind exception does not permit witnesses to relate any of the declarant's statements as to why he held a particular state of mind. Accordingly, the witnesses were allowed to offer testimony that Cohen said, `I'm scared,' but not `I'm scared because Galkin threatened me.'" Apanovitch,33 Ohio App.3d at 21.
 {¶ 19} The supreme court held that "the testimony of state-of-mind witnesses, that the victim was fearful and apprehensive, was not inadmissible hearsay and was properly admitted." Id.
 {¶ 20} Collymore argues that Apanovitch must be limited to allowing only those statements that go directly to the declarant's state of mind and not the reasons why the declarant had the state of mind. The most recent supreme court application of the Apanovitch rule was in Statev. Miller, 96 Ohio St.3d 384, 2002-Ohio-4931, where the court considered a victim's statement to a coworker, made just hours before being shot in the head by her husband, that "[i]f I would come up shot in the head, that bastard [defendant] did it." Id. at ¶ 40. The trial court refused to admit the statement on grounds that it went beyond the declarant's existing state of mind because it expressed a specific belief that Miller might kill her. The supreme court held that the trial court erred by excluding the statement because "the statement was properly admitted as an expression of [the victim's] fear of her husband and did not include detail as to why [the victim] feared her husband. Therefore, under Apanovitch, the statement was admissible." Id. at ¶ 47.
 {¶ 21} As applied in this case, the Apanovitch rule would find admissible hearsay to the effect that the victim had been frightened or scared, but would render inadmissible hearsay to the effect that the victim was frightened and scared because Collymore had threatened her. See State v. Reynolds (1998), 80 Ohio St.3d 670, 687 (finding inadmissible as "clearly hearsay" statements concerning Reynolds's actions in the days before the murder and the victim's statements explaining the reasons why she was scared).
 {¶ 22} Witness Lisa Gillambardo, the woman with whom the victim catered the party on December 15, testified that the victim expressed a fear of Collymore to her that night. In response to a directive to say specifically what the victim had told her, Gillambardo replied, "[t]hat he grabbed her neck and said if I ever saw you with another man, I would kill you." Witness Tamara Bivens was with the victim on December 14, and stated that the victim told her that she feared Collymore. Bivens said, "[the victim] did tell me that she was afraid of him. She told me that before he grabbed her by the neck, and said, if I ever find you with another nigger, I'll kill you." Bivens said that she asked whether the victim was serious about that statement, and the victim said, "yeah, you know, he's crazy."
 {¶ 23} Both statements contain admissible and inadmissible components. The court did not err by permitting the witnesses to repeat statements about the victim's fear. Under Apanovitch, those statements were admissible since they went to the victim's state of mind at the time those statements were made. This would have been a proper use of Evid.R. 803(3).
 {¶ 24} However, the second component of the statements — the reasons why the victim was afraid of Collymore — were inadmissible because they went beyond the scope of Evid.R. 803(3). They served solely to explain the reasons why the victim feared Collymore — that he would kill her if he saw her with another man. Nothing in these statements went to the victim's present state of mind.
 {¶ 25} A third witness, Dawn Watkins, testified to two statements made by the victim that the state asked to have admitted under Evid.R. 803(3). Watkins, a real estate agent and friend of the victim, testified that she assisted the victim with preparations to secure financing for a house and spoke with her on December 15. Watkins said that the victim had expressed fear when they last spoke. When asked whether the victim said why she had been afraid, Watkins said:
 {¶ 26} "He was violent. The last thing — because I was at the mall that day and I didn't pick up the cell because I didn't have good reception. I called her back later that night, and I'm glad I did because it was the last time I talked to her. She said to me that she needed to get away, that she wanted to do it now and that she didn't want to look back ever and she just, she just, — there was — you could just tell."
 {¶ 27} Watkins' testimony was a clear violation of Evid.R. 803(3) and Apanovitch because she pointedly testified to the victim's reasons for being afraid. Watkins gave those reasons in response to this follow-up question from the state: "And what [sic.] did she say why she was afraid of the defendant?" This was not a case of a witness embellishing an answer. The witness gave a direct answer to a direct question. That statement should not have been allowed.
 {¶ 28} In summary, the court erred by permitting the three witnesses to testify to the victim's reasons for fearing Collymore.
 {¶ 29} Our final task is to determine whether the errors were prejudicial. The harmless error standard is applied differently depending on the nature of the error:
 {¶ 30} "If there was a constitutional violation, then, in order to consider the errors harmless, we must find that beyond a reasonable doubt the errors did not contribute to the verdict. Conversely, if the errors were not of a constitutional nature, then they may be deemed harmless so long as there was substantial other evidence to support the guilty verdict." State v. Griffin (2001), 142 Ohio App.3d 65, 79 (citations omitted).
 {¶ 31} The erroneous admission of hearsay is considered an error of constitutional proportions because the right of confrontation is implicated. Id. We therefore review the matter to determine beyond a reasonable doubt if the error contributed to the verdict.
 {¶ 32} The state marshaled significant circumstantial evidence against Collymore. It managed to show that Collymore knew the victim intimately and would have been admitted into her house voluntarily, thus negating the absence of any struggle or break-in. Other evidence placed Collymore at the victim's house around the time of the murder, and further showed that he likely stole one of the victim's paychecks that day. There was no doubt that he tried to cash the most recently-stolen paycheck the same day as the murder. Collymore gave poor alibis, and ultimately had to retract several aspects of his initial statement to the police when confronted with absolute proof to the contrary. In fact, the police found particularly compelling his reaction to being shown proof of trying to cash the victim's paycheck. As will be discussed shortly, other evidence provided a basis for showing that Collymore had at least once choked a woman during a fit of jealousy. Moreover, the state produced a witness who said that Collymore admitted killing the victim.
 {¶ 33} Against this is Collymore's claim that admission of statements relating to the victim's fear of him superseded any other evidence offered by the state. Obviously, the victim's statements concerning her fear of Collymore put the murder into some perspective, although they did not necessarily serve to explain why the victim appeared to let him enter her house, assuming that the absence of forced entry could lead to that assumption. In other words, while the court erroneously admitted into evidence statements concerning the reasons why the victim feared Collymore, the lack of any evidence showing forced entry or a struggle could have permitted the jury to infer that the victim admitted Collymore into her house voluntarily; hence, the jury could have concluded that the victim's "fear" of Collymore was not as great as he now suggests. At the very least, it may not have had so great an impact on the jury's verdict.
 {¶ 34} We believe the court's error was harmless, because even without the evidence that the victim feared Collymore, we can say beyond a reasonable doubt that the error did not contribute to the verdict. The strength of the circumstantial evidence against Collymore was compelling. We recognize that some courts are reluctant to find harmless error based on circumstantial evidence. See, e.g., State v. Griffin, supra. But this cannot be a correct analysis of the law however, as the rule in Ohio is that circumstantial evidence carries the same weight as direct evidence. Apanovitch, 33 Ohio St.3d at 23. Indeed, experience shows us that circumstantial evidence is, in many cases, much more difficult to fabricate than direct evidence. Id.; see, also, Bell, Decision Theory and Due Process: A Critique of the Supreme Court's Lawmaking for Burdens of Proof (1987), 78 Northwestern J.Crim.L. 
Criminology 557, 566, fn. 33. The state's proof eliminated all the variables that Collymore used to explain away his whereabouts during the murder in a manner that direct evidence might not have accomplished.
 II {¶ 35} Collymore next argues that we should adopt the position taken in State v. Hawn (2000), 138 Ohio App.3d 449, in which the Second District Court of Appeals criticized the supreme court's decision in Apanovitch. Collymore correctly concedes that we have no authority to countermand a statement of the law issued by a higher court, and asserts that he is making this argument solely to preserve the issue for further appeal. With that proviso in mind, we summarily overrule this assignment of error.
 III {¶ 36} Prior to trial, the state gave notice that it intended to introduce testimony from two witnesses, in a notice of its intent to use the statements as other acts evidence under Evid.R. 404(B). The state argued that the witnesses would establish a pattern in which Collymore acted abusively and choked the targets of his abuse.
 {¶ 37} Evid.R. 404(B) states that:
 {¶ 38} "Other crimes, wrongs or acts. Evidence of the other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
 {¶ 39} As a general proposition, the state may not try to prove a crime by referring to prior conduct of the accused to suggest that the accused acted with a propensity to commit the crime. In United States v.Wright (C.A. 7, 1990), 901 F.3d 68, 70, the Seventh Circuit explained the purpose and rationale behind Fed.R.Evid. 404(B), the federal counterpart to Evid.R. 404(B):
 {¶ 40} "The purpose of Rule 404(b) is to exclude a type of evidence — evidence that the defendant had previously engaged in a broadly similar criminal activity — which has some probative value but the admission of which would tend as a practical matter to deprive a person with a criminal record of the protection, in future prosecutions, of the government's burden of proving guilt beyond a reasonable doubt. As Justice Jackson pointed out in Michelson [v. United States (1948),335 U.S. 469, 475-76,], a jury is not likely to insist on the government's satisfying so demanding a standard of proof if the defendant is a thoroughly bad sort who even if not clearly guilty of the crime with which he is charged is no doubt guilty of some similar crime or crimes for which he may never have been caught or, if caught, may not have been punished adequately."
 {¶ 41} Weinstein has this to say about the rationale supporting the admission of other acts evidence as proof of the actor's modus operandi:
 {¶ 42} "Other-crime evidence may be admitted if the evidence of the other crimes is so distinctive that it can be seen as a `signature' identifying a unique defendant, such as the infamous Jack the Ripper. Thus, the issue in these cases is whether the defendant committed the act at all, unlike in intent cases, in which the issue is whether the defendant had the requisite state of mind when he or she committed the act. There are many instances in which the details of the other crime show an individuality that is highly probative of the conclusion that the charged crime was committed by the same person.
 {¶ 43} "* * * Evidence of the commission of the same type of crime is not sufficient on this theory unless the particular method of committing the offense, the modus operandi (or m.o.) is sufficiently distinctive to constitute a signature. Other crimes evidence is not permissible to identify a defendant as the perpetrator of the charged act simply because he or she has at other times committed the same garden variety criminal act, since this would be identification based on the forbidden inference of propensity. The question for the court is whether the characteristics relied on are sufficiently idiosyncratic to permit an inference of pattern for purposes of proof." 2 Weinstein's Federal Evidence (2 Ed. 1999), Section 404.22[5][c], at 404-117 to 404-120.
 {¶ 44} The court held a hearing on the issue of other acts evidence prior to trial and ruled that the other acts were admissible on authority of State v. Hood (Dec. 16, 1999), Cuyahoga App. No. 75210, to prove identity by modus operandi under Evid.R. 404(B). Hood had very similar facts: Hood had been accused of strangling a woman to death and the state offered testimony from two women who said that Hood had choked them during arguments. Since Hood denied committing the murder, the identity of the murderer was at issue, hence other acts evidence showing his modus operandi of choking women was admissible.
 {¶ 45} The facts of this case are very close to those of Hood. At trial, one witness testified that Collymore, when angered, resorted to choking females (the second witness was not asked about any choking incidents). The victim in this case died from strangulation and there was competent evidence to show that she had been afraid of Collymore and wished to move away from him for that reason. These facts were sufficiently probative of modus operandi such that the court did not abuse its discretion by permitting the other acts into evidence.
 IV {¶ 46} Collymore argues that the state failed to present sufficient evidence to show that he acted with prior calculation and design when he murdered the victim. He maintains that there was no evidence to show what transpired in the victim's house, other than that the victim died of strangulation, so intent had not been proven; therefore, the court erred by denying his Crim.R. 29(A) motion for judgment of acquittal.
 {¶ 47} Crim.R. 29(A) states that the court shall enter a judgment of acquittal if the evidence is insufficient to sustain a conviction. The court may not grant a judgment of acquittal "if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proven beyond a reasonable doubt."State v. Bridgeman (1978), 55 Ohio St.2d 261, paragraph one of the syllabus.
 {¶ 48} R.C. 2903.01(A) states that "no person shall purposely, and with prior calculation and design, cause the death of another * * *." A person acts "purposely" when "it is his specific intention to cause a certain result." See R.C. 2901.22(A). "Prior calculation and design" is not defined in the Revised Code, but is considered to be more than just an instantaneous decision to kill; it encompasses planning "a scheme designed to carry out the calculated decision to cause the death." SeeState v. Jones, 91 Ohio St.3d 335,348, 2001-Ohio-57 (approving quoted jury instruction on prior calculation and design as "consistent with * * * our own definition of these elements"). Prior calculation and design is considered "a more stringent element than premeditation." State v.Green, 90 Ohio St.3d 352, 357, 2000-Ohio-182, citing State v. Cotton
(1978), 56 Ohio St.2d 8, paragraph one of the syllabus.
 {¶ 49} The act of strangling a victim until death occurs necessarily requires a purpose to kill. The coroner testified that a victim of strangulation could lose consciousness after ten to fifteen seconds, but that it would have taken three to five minutes of additional strangling for death to occur. Moreover, the coroner testified that it would take some physical effort to occlude the neck arteries to the point where death would occur. Consequently, while the decision to strangle a person could be made instantaneously, the length of time required to cause death by strangulation is long enough that an intent to kill must, at all events, be present.
 {¶ 50} The element of prior calculation and design is not subject to a bright-line test. State v. Hanna, 95 Ohio St.3d 285,2002-Ohio-2221, at ¶ 39. In Cotton, paragraph three of the syllabus states:
 {¶ 51} "Where evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified."
 {¶ 52} There are three factors that have been used to consider whether a murder had been committed with prior calculation and design:
 {¶ 53} "(1) whether the accused and the victim knew each other; (2) whether there was thought or preparation in choosing the murder weapon or the murder site; and (3) was the act `drawn out' or `an almost instantaneous eruption of events.'". See State v. Jenkins (1976),48 Ohio App.2d 99, 102.
 {¶ 54} Collymore and the victim certainly knew each other and testimony placed him at the victim's house on the day of the murder. The coroner could not say what ligature, or instrument, had been used to strangle the victim, although she could not exclude the victim's necklace as the ligature in part or alone. Finally, the act of strangulation would have taken several minutes to cause death.
 {¶ 55} Applying these factors in light of the Bridgeman test convinces us that the court did not err by denying Collymore's motion for judgment of acquittal. Admittedly, there is no murder weapon, but the absence of the weapon does not stand alone in our assessment of prior calculation and design. Collymore admitted stealing the victim's paychecks and he killed her in a manner that required minutes to accomplish. At any point during the first three minutes, he could have stopped strangling the victim. Because he continued to strangle the victim for at least three minutes until she died, reasonable minds could find that he engaged in a scheme designed to implement the calculated decision to kill, not that he acted with instantaneous deliberation.
 {¶ 56} Collymore argues that the case law does not support the conclusion that the facts of this case show that he acted with prior calculation and design. Obviously, the facts of each case stand on their own, so decisions in which the facts have been found to specifically show intent have only limited value to this case. Prior calculation and design can be inferred from the facts. While there were no direct facts showing prior calculation and design, the circumstantial evidence did so, at least to the point where the court was justified in finding that reasonable minds could have disagreed on the point for purposes of a Crim.R. 29(A) motion for judgment of acquittal.
 V {¶ 57} Collymore complains that the jury's verdict is against the manifest weight of the evidence.
 {¶ 58} We need not restate the facts previously stated. It suffices that the state presented a compelling case of circumstantial evidence to show that Collymore caused the victim to fear him, that he had twice choked women after disagreeing with them, that he had access to the victim's house on the day of the murder, that he stole her paycheck and tried to cash it shortly after the murder occurred, and that none of his alibis held the slightest bit of water. His inconsistent versions of when he took the paycheck and where he was at the time of the murder were particularly damaging to him. Finally, Collymore's cellmate testified that Collymore admitted that he killed the victim.
 {¶ 59} As with all matters going to the credibility of the evidence and witnesses, it is for the jury, not this court, to weigh the evidence. State v. Jamison (1990), 49 Ohio St.3d 182. The jury could reasonably have found the state's evidence persuasive.
 VI {¶ 60} Collymore next raises as grounds for error several instances of prosecutorial misconduct. We review claimed errors of state misconduct to determine whether the remarks were improper and, if so, whether the remarks materially prejudiced the rights of the accused.State v. Smith (1984), 14 Ohio St.3d 13, 14. Claims of prosecutorial misconduct are subject to the plain error rule, meaning that unless the defense objected to the purported acts of misconduct, all but plain error is waived. State v. Slagle (1992), 65 Ohio St.3d 597, 604.
 A {¶ 61} Collymore complains that during voir dire, the state "began to hammer home the idea that this was a crime of domestic violence, committed by Mr. Collymore against [the victim]." He claims that the state wished to inform the jury that Collymore had a history of some prior instances of committing acts of domestic violence against the victim.
 {¶ 62} Collymore only cites to one specific example during voir dire. That example arose after the state asked prospective jurors whether they had any experience with domestic violence. One juror responded affirmatively and said that his daughter-in-law had beaten his son with a hammer. After hearing specifics of the act of domestic abuse, the prosecuting attorney said:
 {¶ 63} "We would all agree that committing a crime of domestic violence or perpetrating violence to anyone is a crime. You would agree with that? * * * Just because you are involved in a relationship doesn't mean they are willing to be the punching bag for someone's aggression. It still makes it a crime. Fair enough?"
 {¶ 64} Collymore did not object to the state's questions, so all but plain error is waived. "Notice of plain error * * * is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." State v.Long (1978), 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph three of the syllabus.
 {¶ 65} Not only is there no plain error shown, we see nothing in the prosecutor's remarks that could be construed as misconduct in the first instance. The state's ability to prove the murder charges rested almost entirely on establishing that Collymore strangled the victim in line with conduct that made the victim fear Collymore, and in conformity with past conduct in which he choked women with whom he had been involved. The state was therefore entitled to ask prospective jurors about any history they might have had with acts of domestic violence as a means of determining their ability to give fair consideration to the issues that would arise at trial.
 B {¶ 66} During the state's opening statement, the prosecuting attorney said that even though Collymore and the victim had terminated their relationship well before the murder, Collymore was possessive and still tried to control the victim. The prosecuting attorney said, "* * * you will learn that the characteristics of this particular homicide, you will learn a little about how we go about classifying homicides. And I will call it a domestic violence." Collymore complains that the prosecuting attorney was suggesting that he had some expertise and was able to "correctly classify" this killing as an act of domestic violence.
 {¶ 67} Again, the defense failed to object to the offending remark, and no plain error has been shown. In fact, counsel is given wide latitude to use the opening statement to tell the jury their theory of the case and just what they expect the evidence to show. The state's decision to "classify" the case as a murder stemming from domestic violence was one it was entitled to make.
 C {¶ 68} Collymore next claims that during closing argument the state made such extreme and frequent misstatements of fact that they could not have been inadvertent. None of the alleged misstatements were the subject of any objection, and no plain error is shown.
 D {¶ 69} During the redirect testimony of a police detective who spoke with Collymore's cellmate, the prosecuting attorney asked the detective whether there had been any indication that the cellmate would receive a favorable deal in exchange for turning over information about Collymore. The prosecuting attorney asked, "[d]id I ever indicate to you that [the cellmate] would receive any kind of favorable treatment, any deal or incentive in any way?" Collymore argues that this amounted to the prosecuting attorney testifying and trying to bolster the cellmate's credibility.
 {¶ 70} We find the state's question did not constitute misconduct, primarily by taking into account the circumstances that caused the state to ask the question. During the detective's cross-examination, the defense first brought up the subject of the cellmate. In response to a defense question about the cellmate, the detective said that he learned that the cellmate had contacted the prosecuting attorney a little more than two months before trial. The detective said that the prosecuting attorney asked him to speak with the cellmate. The defense then asked a series of questions to determine (or imply) that the cellmate had been promised favors in exchange for information about Collymore. The detective denied being told to offer the cellmate favorable treatment.
 {¶ 71} With this context, the state understandably asked the detective on redirect whether the prosecuting attorney had instructed the detective to tell the cellmate that favorable treatment might be given in exchange for divulging Collymore's confession. It is true that the state's question had a self-serving component — by its very nature it tended to bolster the credibility of the prosecuting attorney. However, the main thrust of the question was factual in nature: had promises of favorable treatment been made? Surely, the state was entitled to counter the defense suggestion that the cellmate received a benefit for the information.
 {¶ 72} Moreover, we find no error as a practical matter insofar as Collymore objects that the prosecuting attorney asked the question on his own behalf. There were two assistant prosecuting attorneys trying the case for the state, and there would be no doubt that the second prosecuting attorney could have put the same question about his co-counsel to the detective without objection.
 E {¶ 73} Collymore's primary alibi witness was a high school student who testified that Collymore picked her up from school around lunchtime on the day of the murder. At three different points in her cross-examination, the state suggested that it could contradict parts of the student's direct testimony with evidence. Collymore complains that the state did not produce those records, suggesting to him that it was merely "bluffing" the witness and jury in a deliberate attempt to mislead.
 {¶ 74} We reject the first two specific instances. First, the student said that she "never stepped foot in school" on the Thursday before the murder because she spent the day with Collymore. In response to that assertion, the prosecuting attorney said, "if I was to show you your attendance records that show you're in attendance on Thursday, the 13th, at James Ford Rhodes High School, would you be surprised by that?" The student replied, "No." Once the student willingly contradicted her testimony, the state had no reason to present proof of that contradiction.
 {¶ 75} Likewise, in the second claimed instance of error, the student claimed that on Thursday, December 13th, she was with Collymore from 8:00 a.m. to 2:30 p.m. When the prosecuting attorney said, "so, if Terrence's work records for that Thursday reflected that he was working during that time, that doesn't change your story in any way, does it." The student answered, "I guess that it would. I told you that I couldn't remember the dates." Extending the "bluffing" metaphor used by Collymore, we find no error because the student contradicted her own testimony by agreeing that her initial recollection could be wrong — hence, Collymore's witness failed to call the state's bluff and forced it to show its cards.
 {¶ 76} The final claimed instance of "bluffing" occurred during the student's recross-examination. Referring to a detective sitting at the state's trial table, the prosecuting attorney asked the student if she told the detective that Collymore's sister was calling the student and harassing her to the point where the student told the detective that she had to shut off her telephone. The student firmly denied making that statement. The prosecuting attorney then said, "if [the detective] got up and said that, he would be a liar; is that correct?" The student replied, "No, I didn't tell him anything like that."
 {¶ 77} Although the student held to her original statement about not telling the detective that she considered disconnecting her telephone, we fail to see how the state would have been required to call the detective as a rebuttal witness. The whole point of cross-examination is to challenge a witness. Obviously, any questions asked of a witness must be supported by a good faith belief that there are factual predicates for the questions. See State v. Gillard (1988),40 Ohio St.3d 226, paragraph two of the syllabus. But in the absence of an objection, as here, the state is under no obligation to voluntarily set forth rebuttal evidence to establish that it had such a good faith belief that a factual predicate existed for the question. We presume that a factual predicate did exist. Id. at 231.
 F {¶ 78} As part of its case-in-chief, the state told the court that it would present two witnesses, both of whom were formerly involved with Collymore, who would testify that he choked them. The state argued that these incidents were unique and established a pattern of conduct that fit within the murder. However, Collymore claims that the girlfriend testified far differently than represented by the state. He maintains that the state duped the court into permitting the testimony.
 {¶ 79} We fail to see how the incident involving the girlfriend was so different that the state must be found to have deceived the court into permitting the testimony. The girlfriend, then an active reservist in the military, testified that even though she and Collymore were engaged to be married, he "was pretty insecure about me no matter what regarding my workplace." After one incident, the girlfriend became "fed up" and told Collymore to leave. He refused and insisted that she admit to sleeping with someone in her reserve unit. She replied that he would have to kill her before she would admit to something she didn't do. At that point, Collymore began choking her. He thereafter tied her with duct tape.
 {¶ 80} To be sure, the murder did not involve the use of duct tape, but the state did not tell the court that it did. It merely pointed out that "we have statements from these two particular witnesses * * * who were assaulted by the defendant and the method of assault that occurred was by way of choking." Admittedly, only one of the two witnesses testified to being choked by Collymore, but we cannot say that the state misled the court in any relevant respect when offering the other acts evidence.
 VII {¶ 81} Collymore argues that counsel was ineffective for failing to argue that State v. Apanovitch did not apply to testimony that the victim feared him. Our discussion of the first assignment of error moots this point.
 VIII {¶ 82} In his final argument, Collymore maintains that the court erred by sentencing him to maximum, consecutive terms of incarceration on charges of forgery and uttering the victim's paycheck, without first making the requisite findings and reasons in support of those findings. In addition, he claims the court failed to engage in a proportionality review of the sentences.
 A {¶ 83} The court made the following remarks during sentencing relative to the forgery and uttering counts:
 {¶ 84} "Relative to counts one, two, three, four and five, the Court finds that these are the worst forms of the offense. That there is a great likelihood of recidivism. The Court observes that the defendant has previously been in jail — had been in person. And the Court further finds that consecutive sentences are necessary to protect the public from future crimes. Further finds that the defendant's history of criminal conduct demonstrates consecutive sentences are necessary to protect the public from future crimes. Therefore, all counts — all counts run consecutive to each other."
 {¶ 85} Beginning first with the claim of error relating to maximum sentences, we note that the court may impose the maximum prison term "only upon those who committed the worst form of the offense [and] upon offenders who pose the greatest likelihood of committing future crimes * * *." See R.C. 2929.14(C). Not only must the court make a specific finding to support the imposition of maximum sentence, it must provide its reasons for doing so. See R.C. 2929.19(B)(2). We will reverse the trial court's imposition of sentences if we find by clear and convincing evidence that the sentence is not supported by the record or is contrary to law. R.C. 2953.08(G).
 {¶ 86} The court articulated adequate statutory findings for imposing the maximum sentence: that Collymore committed the worst form of the offense and posed a "great likelihood of recidivism." The court did not, however, state any reasons in support of the finding that the offenses were the worst form of the offense. Hence, there is no proper basis for imposing maximum sentence based on the crimes of forgery and uttering being the worst form of the offense.
 {¶ 87} This left as a basis for imposing the maximum sentence the court's finding that Collymore posted a great likelihood of recidivism. Although the court did not say so explicitly, we suppose that the court's reference to Collymore's prior conviction for domestic violence, coupled with evidence showing that the murder may have been motivated by need to continue to dominate women with whom he had relationships, could have shown that the court believed that Collymore would continue to engage in this type of conduct in the future. Had this truly been the court's thinking, it should have said so.
 {¶ 88} We do not require the court to utter any magic words when giving its reasons for making a finding under R.C. 2929.14(C). This is because we recognize that the trial courts are, by necessity, run without the opportunity for the kind of reflective thought which we on the court of appeals enjoy. The trial court may be juggling several matters at one time, and there are enough of us who have served as trial judges to appreciate that perfection in sentencing under these kinds of circumstances is simply impossible. Therefore, it will ordinarily suffice if the sentencing court gives us enough information from which we can rationally divine the basis for the court's sentencing decisions.
 {¶ 89} This is not to say, however, that we will engage in guesswork when reviewing sentencing judgments. The requirements for imposing a maximum sentence are straight-forward and not so burdensome that the trial courts should be excused from carrying them out, even when taking into account the hectic nature of our trial courts. To date, we have remanded for resentencing more than one hundred forty appeals in the past five years, many being cases in which the court failed to state its reasons on the record. These remands come at significant costs to the public, which must subsidize transportation expenses, attorney fees and incidental costs for most defendants. To be blunt, we are baffled as to why the courts are unable to follow the sentencing statutes as a matter of rote. In fact, it stands to reason that the court's failure to articulate on the record reasons in support of a maximum sentence necessarily implies that no such reasons exist.
 {¶ 90} With these thoughts in mind, we find it necessary to reverse the maximum sentence. As we said, it may be that the court believed that Collymore's prior conviction for domestic violence, coupled with the circumstances of this murder, may have led the court to believe that a maximum sentence was appropriate. If those were the court's reasons, they should have been stated explicitly. We trust the court will do so upon remand.
 {¶ 91} We have similar thoughts about the court's decision to impose the sentences consecutively. In order to justify consecutive sentences, the court must make two findings. First, it must find either that consecutive sentences are necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. See R.C. 2929.14(E)(4). Second, as applicable here, the court must also find that the harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct. Id. As with a maximum sentence, the court must state its reasons for imposing consecutive sentences. See R.C. 2929.19(B)(2).
 {¶ 92} The court adequately stated the need to protect the public as a finding for imposing consecutive sentences. Unfortunately, the court failed to make a finding that the harm caused by the offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct. Moreover, the court failed to state any reasons to justify its findings. Accordingly, we sustain the assignment of error relating to sentencing and remand for resentencing.
Affirmed and remanded for resentencing.
PATRICIA A. BLACKMON, J., CONCURS.
 ANNE L. KILBANE, J., DISSENTS WITH SEPARATE OPINION.